# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

Argued February 20, 2015       Decided August 4, 2015

No. 14-7004

SAM OSBORN, ET AL.,
APPELLANTS

v.

VISA INC., ET AL.,
APPELLEES

---

Consolidated with 14-7005, 14-7006

---

Appeals from the United States District Court
for the District of Columbia
(No. 1:11-cv-01831)
(No. 1:11-cv-01882)
(No. 1:11-cv-01803)

---

*Steve W. Berman* argued the cause for appellants. With him on the briefs were *Craig L. Briskin*, *Michael G. McLellan*, *Douglas G. Thompson*, *Brooks E. Harlow*, and *Don A. Resnikoff*. *David A. LaFuria* entered an appearance.

*Kenneth A. Gallo* argued the cause for appellees. With him on the brief were *Mark R. Merley*, *Matthew A. Eisenstein*, *Mark P. Ladner*, *Michael B. Miller*, *William F. Cavanaugh*,

and *Peter E. Greene*. *Robert P. LoBue* and *Ana Maria Iquat* entered appearances.

Before: TATEL, SRINIVASAN and WILKINS, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* WILKINS.

WILKINS, *Circuit Judge*: Users and operators of independent (non-bank) automated teller machines (ATMs) brought these related actions against Visa, MasterCard, and certain affiliated banks, alleging anticompetitive schemes for pricing ATM access fees. The crux of the Plaintiffs' complaints is that when someone uses a non-bank ATM, the cardholder pays a greater fee and the ATM operator earns a lower return on each transaction because of certain Visa and MasterCard network rules. These rules prohibit differential pricing based on the cost of the network that links the ATM to the cardholder's bank. In other words, the Plaintiffs allege anticompetitive harm because Visa and MasterCard prevent an independent operator from charging less, and potentially earning more, when an ATM transaction is processed through a network unaffiliated with Visa and MasterCard.

The District Court concluded that the Plaintiffs had failed to allege essential components of standing, and also that they had failed to allege an agreement in restraint of trade cognizable under the Sherman Antitrust Act. *See* 15 U.S.C. § 1. We disagree, and so we vacate and remand these cases for further proceedings based on the proposed amended complaints.

3

**I.**

ATMs "have been a part of the American landscape since the 1970s – beacons of self-service and convenience, they revolutionized banking in ways we take for granted today." Linda Rodriguez McRobbie, *The ATM is Dead. Long Live the ATM!*, SMITHSONIAN.COM (Jan. 8, 2015), http://www.smithsonianmag.com/history/atm-dead-long-live-atm-180953838/. One view is that "[t]hey live to serve; we only really notice them when we can't seem to locate one." *Id.* But Plaintiffs tell us they *do* take notice of ATMs – specifically, of the fee structure that attaches to their use and what they gain or lose from it. We credit for purposes of this appeal all facts alleged in the proposed amended complaints.

Some background history: Until the mid-1990s, consumers who wished to withdraw cash from their bank accounts generally could do so only by visiting a bank branch or a bank-operated ATM. But states began to abolish various laws that had prohibited ATM operators from charging access fees directly to cardholders. This created a financial incentive for nonbanks to enter the ATM market, and independent ATMs took root accordingly. *See* National ATM Council Proposed Second Amended Complaint ("NAC Prop. Compl.") ¶ 43; Osborn Proposed Second Amended Complaint ("Osborn Prop. Compl.") ¶ 66. These independent ATMs connect to a cardholder's bank through an ATM network. The most popular networks are operated by Visa (the Plus, Interlink, and VisaNet networks) and MasterCard (the Cirrus and Maestro networks). Rival networks include Star, NYCE, and Credit Union 24. NAC Prop. Compl. ¶ 40.

Today, a cardholder can use any independent ATM to access her bank account, so long as her bank card and the ATM are linked by at least one common network. Most bank

cards indicate the networks to which they are linked with logos printed on the back of the card, referred to colloquially as "bugs." *Id.*

Independent ATM operators rely on two streams of revenue to sustain their businesses. The first is the "net interchange" fee: the gross interchange fee paid by the cardholder's bank to the ATM operator, which runs between $0.00 and $0.60 per transaction, less any network services fee charged by the ATM network. MasterCard and Visa generally charge high network services fees, which means that ATM operators receive low net interchange fees – running between $0.06 and $0.29 for domestic transactions, and even less for international transactions – for transactions on these networks. Several competing networks charge comparatively low network services fees, thus enabling an ATM operator to collect a higher net interchange fee (up to $0.50 per transaction) when using the lower-fee networks. *Id.* ¶ 59.

The second source of revenue comes from the ATM access fees paid by the cardholder. The average access fee in 2012 was $2.10. *See* Osborn Prop. Compl. ¶ 99 (citing GOV'T ACCOUNTABILITY OFFICE, GAO-13-266, AUTOMATED TELLER MACHINES: SOME CONSUMER FEES HAVE INCREASED 14 (2013)).

Visa and MasterCard each impose, as a condition for ATM operators to access their networks, a sort of non-discrimination or most favored customer clause called the "Access Fee Rules." These rules provide that no ATM operator may charge customers whose transactions are processed on Visa or MasterCard networks a greater access fee than that charged to any customer whose transaction is

processed on an alternative ATM network.[1]  Thus, under the Access Fee Rules, operators cannot say to cardholders:  "We will charge you $2.00 for a MasterCard or Visa transaction, but if your card has a Star or Credit Union 24 bug on it, we will charge you only $1.75."

Both Visa and MasterCard were owned and operated as joint ventures by a large group of retail banks at the time that the Access Fee Rules were adopted.  NAC Prop. Compl. ¶ 89.  Although these member banks later relinquished direct control over the bankcard associations through public offerings, the IPOs did not alter the substance of the Access Fee Rules, which remain intact to this day.

---

[1]  The challenged Visa rule provides:

> An ATM Acquirer may impose an Access Fee if:  It imposes an Access Fee on all other Financial Transactions through other shared networks at the same ATM; The Access Fee is not greater than the Access Fee amount on all other Interchange Transactions through other shared networks at the same ATM . . . .

NAC Prop. Compl. ¶ 68 (citing Visa Int'l Operating Regulations ¶ 4.10A (Oct. 15, 2012)).  The challenged MasterCard rule provides:

> An Acquirer must not charge an ATM Access Fee in connection with a Transaction that is greater than the amount of any ATM Access Fee charged by that Acquirer in connection with the transactions of any other network accepted at that terminal.

*Id.* ¶ 64 (citing MasterCard's Cirrus Worldwide Operating Rule ¶ 7.14.1.2 (Dec. 21, 2012)).

Plaintiffs assert that these rules illegally restrain the efficient pricing of ATM services. They characterize the Access Fee Rules as constituting an "anti-steering" regime that prevents independent ATM operators from incentivizing cardholders to choose and use cards "that are more efficient and less costly than either Visa or MasterCard's." NAC Prop. Compl. ¶ 1.

This consolidated appeal arises from decisions in three separate but related civil actions. The first action, *Stoumbos v. Visa*, was filed by a debit cardholder, Mary Stoumbos, who paid access fees in connection with ATM transactions at various independent ATMs. The second action, *Mackmin v. Visa* (referred to here as the *Osborn* case), was filed by four consumers of independent and bank-run ATM services. The third action, *National ATM Council v. Visa*, was brought by a leading association of independent ATM operators and several individual ATM operators. The Plaintiffs allege violations of Section 1 of the Sherman Act as well as various state laws, and they name Visa and MasterCard entities as defendants. In addition, the *Osborn* plaintiffs name certain member banks as co-defendants.

On February 12, 2013, the District Court concluded that the Plaintiffs' respective complaints had failed to allege facts sufficient to establish standing and, in the alternative, lacked adequate facts to establish concerted activity under Section 1 of the Sherman Act. *Nat'l ATM Council, Inc. v. Visa Inc.*, 922 F. Supp. 2d 73 (D.D.C. 2013) ("*NAC I*"). It dismissed not just the complaints, but the *cases* without prejudice.

In an attempt to toll the statute of limitations, Plaintiffs timely moved the District Court to modify its judgment from dismissal of the *cases* without prejudice to dismissal of the *complaints* with leave to replead. Plaintiffs simultaneously

submitted proposed amended complaints. On December 19, 2013, the District Court denied Plaintiffs' motions after concluding that their proposed amended complaints still lacked sufficient facts to establish standing or a conspiracy. *Nat'l ATM Council, Inc. v. Visa Inc.*, 7 F. Supp. 3d 51 (D.D.C. 2013) ("*NAC II*"). The Plaintiffs appeal.

## II.

Procedural quirks notwithstanding, we review *de novo* the District Court's determination that the filing of the amended complaints would be futile due to the perceived deficiencies of those complaints under Rules 12(b)(1) and 12(b)(6). *See Kim v. United States*, 632 F.3d 713, 715 (D.C. Cir. 2011) (stating standard of review for FED. R. CIV. P. 12(b)(1) & 12(b)(6)). To reach that bottom line, we must do some procedural untangling.

The District Court's February 12 order dismissed the cases without prejudice. The principle guiding a dismissal without prejudice is that absent futility or special circumstances (such as undue delay, bad faith, or dilatory motive), a plaintiff should have the opportunity to replead so that claims will be decided on merits rather than technicalities. *Foman v. Davis*, 371 U.S. 178, 181-82 (1962); *see also English-Speaking Union v. Johnson*, 353 F.3d 1013, 1021 (D.C. Cir. 2004). Where, as it appears was the case here, a plaintiff has not notified the district court that a statute of limitations issue might bar the plaintiff "from correcting the complaint's defects and filing a new lawsuit," a dismissal of the case without prejudice is not an abuse of discretion. *See Ciralsky v. CIA*, 355 F.3d 661, 671 (D.C. Cir. 2004).

Plaintiffs followed an appropriate course against this background, asking the District Court to modify its judgment

pursuant to Rule 59 – so that merely the complaint, and not the case, would have been dismissed – and simultaneously filing a proposed amended complaint. *See Firestone v. Firestone*, 76 F.3d 1205, 1208 (D.C. Cir. 1996) (describing this as proper procedure). In its December 19 opinion on those motions, the District Court asked and answered the essential question – whether leave to amend was futile – but the accompanying order purported to deny on the merits Plaintiffs' motion for leave to amend their complaints, and to deny as moot their motion to modify the February 12 judgment. As a technical matter, the District Court lacked authority to rule on the merits of the Rule 15(a) motion because it did not modify its final judgment dismissing those cases. *See Ciralsky*, 355 F.3d at 673; *Firestone*, 76 F.3d at 1208.

Because the District Court's denial of the Plaintiffs' Rule 59(e) motion as moot was based on its conclusion that amendment of the complaints would be futile, *see NAC II*, 7 F. Supp. 3d at 54, we review the decision below as a denial on the merits of the motion to modify the judgment. On this question, we look for abuse of discretion. *Firestone*, 76 F.3d at 1208 (citing *Browder v. Dir., Ill. Dep't of Corrections,* 434 U.S. 257, 263 n.7 (1978)). An abuse of discretion necessarily occurs when a district court misapprehends the underlying substantive law, and we examine the underlying substantive law *de novo*. *Conservation Force v. Salazar*, 699 F.3d 538, 542 (D.C. Cir. 2012); *see also Dyson v. District of Columbia*, 710 F.3d 415, 420 (D.C. Cir. 2013) (reviewing *de novo* questions of law underlying district court's denial of plaintiff's Rule 59(e) motion). In other words, the District Court's futility conclusion turned on a legal determination – here, the sufficiency of the proposed amended complaints

under Rule 12(b)(1) or Rule 12(b)(6) – and we review those legal determinations independently of the District Court.[2]

That brings us to the substantive questions we must decide. We look first, as always, at the question of whether the Plaintiffs have standing and second, whether the Plaintiffs' proposed amended complaints adequately stated a claim.

**A.**

The District Court determined that the Plaintiffs lacked Article III standing because their allegations showed neither injury nor redressability. *NAC II*, 7 F. Supp. 3d at 60-61. To establish standing, a plaintiff must show that (i) it has "suffered a concrete and particularized injury in fact, (ii) that was caused by or is fairly traceable to the actions of the defendant, and (iii) is capable of resolution and likely to be redressed by judicial decision." *Sierra Club v. EPA*, 755 F.3d 968, 973 (D.C. Cir. 2014) (citing *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560-61 (1992)).

Plaintiffs contend that "in the absence of the access fee rules, ATM operators would offer consumers differentiated access fees at the point of transaction, consumers would then demand multi-bug PIN cards from their banks, their banks would provide these cards, and the market for network

---

[2] The parties have focused on the sufficiency of the proposed amended complaints, rather than the complaints originally dismissed by the District Court, and the Plaintiffs have not argued that the initial complaints should not have been dismissed. *See* Appellants' Br. 8 n.4 (explaining that the complaints dismissed on February 12 are of "questionable" relevance here, as this appeal is confined to the District Court's rulings on the proposed amended complaints).

services would become more competitive, all resulting in more choice of networks and lower access fees for consumers." *NAC II*, 7 F. Supp. 3d at 60. The District Court held that this was an "attenuated, speculative chain of events[] that relies on numerous independent actors, including the PIN card issuing banks." *Id.* We disagree, and we think the District Court was demanding proof of an economic theory that was not required in a complaint.

A plaintiff's burden to demonstrate standing grows heavier at each stage of the litigation. *See Lujan*, 504 U.S. at 561. Thus, "[a]t the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presum[e] that general allegations embrace those specific facts that are necessary to support the claim." *Id.* (internal quotation marks omitted); *see also Am. Nat. Ins. Co. v. FDIC*, 642 F.3d 1137, 1139 (D.C. Cir. 2011) (observing that on a Rule 12(b)(1) motion, we "grant[] plaintiff the benefit of all inferences that can be derived from the facts alleged").

Two distinct theories of injury are relevant in this appeal. First is the ATM operators' theory of harm. The operators allege that MasterCard and Visa, working in concert with the member banks, have maximized their own returns on each transaction, thereby minimizing the independent ATM operators' cut. *See* NAC Prop. Compl. ¶¶ 77-88. According to the operators, in a competitive market, the imbalance between low- and high-cost networks "would be corrected by a price differential for the final service, and consumers would respond to lower prices for a fungible service by switching." *Id.* ¶ 79. But while ATM operators can respond by routing transactions on multi-bugged cards over the lowest priced networks, they are prevented from using differential pricing to incentivize customers to use such cards. As the operator

plaintiffs put it, "ATM operators are prohibited from setting the price differential needed to encourage consumers to switch." *Id*. Visa and MasterCard are thereby insulated from competition with other networks and can charge supra-competitive network services fees with impunity.

The consumers' theory of harm complements that of the operators. The consumers allege that they pay inflated access fees when they visit ATMs. They believe that the Access Fee Rules inhibit competition in both the network services market and the market for ATM access fees. But for the Rules, some ATM operators would offer discounted access fees for cards linked to lower-cost ATM networks, and this discounting would create downward pressure on access fees generally. Osborn Prop. Compl. ¶ 94-107; Stoumbos Proposed Second Amended Complaint ("Stoumbos Prop. Compl.") ¶¶ 81-100.

Economic harm, such as that alleged here, "is a classic form of injury-in-fact." *Danvers Motor Co. v. Ford Motor Co.*, 432 F.3d 286, 293 (3d Cir. 2005). But the Defendants painted Plaintiffs' allegations as speculative and conclusory, and the District Court agreed. *NAC II*, 7 F. Supp. 3d at 60. The District Court reasoned that the "protracted chain of causation" alleged by Plaintiffs "fails both because of the uncertainty of several individual links and because of the number of speculative links that must hold for the chain to connect the challenged acts to the asserted particularized injury." *Id*. (quoting *Fla. Audubon Soc'y v. Bentsen,* 94 F.3d 658, 670 (D.C. Cir. 1996) (en banc)) (internal quotation marks omitted). This was error.

At the pleadings stage, a court "must accept as true all material allegations of the complaint," *Warth v. Seldin*, 422 U.S. 490, 501 (1975), an obligation that we have recognized "might appear to be in tension with the Court's further

admonition that an allegation of injury or of redressability that is too speculative will not suffice to invoke the federal judicial power," *United Transp. Union v. ICC*, 891 F.2d 908, 911 (D.C. Cir. 1989) (internal quotation marks omitted). But "this ostensible tension is reconciled by distinguishing allegations of *facts, either historical or otherwise demonstrable*, from allegations that are really predictions." *Id.* at 912 (emphasis added). Thus, "[w]hen considering any chain of allegations for standing purposes, we may reject as overly speculative . . . those types of allegations that are not normally susceptible of labelling as 'true' or 'false.'" *Id*.

Plaintiffs' theories here *are* susceptible to proof at trial. The Plaintiffs allege a system in which Visa and MasterCard insulate their networks from price competition from other networks. This insulation yields higher profits for Visa and MasterCard (and higher returns for their shareholders), at the cost of consumers and independent ATM operators. The economic injury alleged is present and ongoing.

Moreover, the complaints contain factual details, including details about the Plaintiffs' own conduct, that support the alleged causal link between the Access Fee Rules and the economic harm. According to the Plaintiffs, Visa and MasterCard currently capture over half of all ATM transactions, despite charging higher fees than rival networks. *See* Osborn Prop. Compl. ¶¶ 91, 101. Plaintiffs further allege that independent ATM operators (such as the operator plaintiffs) have the desire and technical capacity to offer discounts on cards linked to low-cost networks. *See* NAC Prop. Compl. ¶¶ 79, 82; Stoumbos Prop. Compl. ¶ 85. They contend that consumers, such as Stoumbos and the Osborn plaintiffs, are "sensitive to differences in ATM Access Fees and where possible will seek out ATMs with the lowest

Access Fees." Stoumbos Prop. Compl. ¶ 86; *accord* Osborn Prop. Compl. ¶ 105.

To be certain, Plaintiffs also rely on certain economic assumptions about supply and demand: that other consumers besides the Plaintiffs are price conscious; that bank operators will respond to consumer demand for cards tied to low-cost networks; and that in the face of competitive pressure, ATM networks will reduce their network fees. But these sorts of assumptions are provable at trial. *See United Transp. Union*, 891 F.2d at 912 n.7 (allegations "founded on economic principles," while "perhaps not as reliable as allegations based on the laws of physics, are at least more akin to demonstrable facts than are predictions based only on speculation."); *Ill. Brick Co. v. Illinois*, 431 U.S. 720, 758 (1977) (recognizing, in the context of damages, that antitrust cases often involve "tracing a cost increase through several levels of a chain of distribution"). Indeed, allegations of economic harm "based on standard principles of 'supply and demand'" are "routinely credited by courts in a variety of contexts." *Adams v. Watson*, 10 F.3d 915, 923 (1st Cir. 1993).

In deciding that the Plaintiffs had failed to establish injury and redressability, the District Court relied on cases that had been decided at summary judgment. *See NAC II*, 7 F. Supp. 3d at 60 (citing *Lujan*, 504 U.S. at 560-61; *Valley Forge Christian Coll. v. Ams. United for Separation of Church and State, Inc.*, 454 U.S. 464, 496 n.10 (1982); *Fla. Audubon Soc'y*, 94 F.3d at 670); *see also NAC I*, 922 F. Supp. 2d at 81 (citing *Dominguez v. UAL Corp.*, 666 F.3d 1359, 1362 (D.C. Cir. 2012); *Gerlinger v. Amazon.com Inc.; Borders Group, Inc.*, 526 F.3d 1253, 1255-56 (9th Cir. 2008)). On a motion for summary judgment by a defendant, the question is not whether the plaintiff has asserted a plausible theory of harm, but rather whether the plaintiff has

offered sufficient evidence for a reasonable jury to conclude that its theory is correct. *See Fla. Audubon Soc'y*, 94 F.3d at 672 (at summary judgment, the court "need not accept appellants' alleged chain of events if they are unable to demonstrate competent evidence to support each link"); *Dominguez*, 666 F.3d at 1362-64 (evaluating plaintiff's theory of supra-competitive pricing and concluding that no record evidence supported its theory of harm). A Rule 12(b)(1) motion, however, is not the occasion for evaluating the empirical accuracy of an economic theory. Because the economic facts alleged by the Plaintiffs are specific, plausible, and susceptible to proof at trial, they pass muster for standing purposes at the pleadings stage.

## B.

We next turn to the District Court's alternative holding that the Plaintiffs failed to plead adequate facts to establish the existence of concerted activity. Under the familiar *Twombly-Iqbal* standard, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" *Jones v. Horne*, 634 F.3d 588, 595 (D.C. Cir. 2011) (quoting *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009)).

Section 1 of the Sherman Act prohibits any "contract, combination . . . or conspiracy, in restraint of trade or commerce." 15 U.S.C. § 1. Thus, to make out a claim under this section, the Plaintiffs must allege that "the challenged anticompetitive conduct stems from . . . an agreement, tacit or express." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 553 (2007) (internal quotation marks and brackets omitted). If such an agreement is among competitors, we refer to it as a horizontal restraint. *See Bus. Electronics Corp. v. Sharp Electronics Corp.*, 485 U.S. 717, 730 (1988) (contrasting

horizontal agreements from vertical restraints imposed by firms at different levels of distribution). The complaints are sufficient if they contain "enough factual matter (taken as true) to suggest that an agreement was made." *Id*. at 556. We conclude that the Plaintiffs have alleged a horizontal agreement to restrain trade that suffices at the pleadings stage.

According to the Plaintiffs, the member banks developed and adopted the Access Fee Rules when the banks controlled Visa and MasterCard. The rules served several purposes. First and foremost, the rules protected Visa and MasterCard from competition with lower-cost ATM networks, thereby permitting Visa and MasterCard to charge supra-competitive fees. Osborn Prop. Compl. ¶ 80. The rules also benefited the banks, who were equity shareholders of the associations (and therefore financial beneficiaries of the deal). *Id*. ¶¶ 116-117. And the rules protected banks from competition with each other over the types of bugs offered on bank cards. *See id*. ¶ 80 (alleging that "banks were assured that their MasterCard customers would not have to pay more in fees than their Visa cardholders, and they would not face competition at the network level").

That the rules were adopted by Visa and MasterCard as single entities does not preclude a finding of concerted action. The Supreme Court has "long held that concerted action under [Section] 1 does not turn simply on whether the parties involved are legally distinct entities," but rather depends upon "a functional consideration of how the parties involved in the alleged anticompetitive conduct actually operate." *Am. Needle, Inc. v. Nat'l Football League*, 560 U.S. 183, 191 (2010). Thus, "a legally single entity violate[s] [Section] 1 when the entity [i]s controlled by a group of competitors and serve[s], in essence, as a vehicle for ongoing concerted activity." *Id*.

The allegations here – that a group of retail banks fixed an element of access fee pricing through bankcard association rules – describe the sort of concerted action necessary to make out a Section 1 claim. *See, e.g.*, *Nat'l Soc'y of Prof'l Eng'rs v. United States*, 435 U.S. 679 (1978) (upholding antitrust action against association that imposed ethical rule prohibiting competitive bidding by members); *Robertson v. Sea Pines Real Estate Cos.*, 679 F.3d 278, 288-89 (4th Cir. 2012) (finding adequate allegations that real estate brokerages agreed to restrain market competition through anticompetitive service rules in their joint venture). Indeed, in 2003 the Second Circuit upheld a trial court's finding that rules adopted by Visa and MasterCard that prohibited member banks from issuing American Express or Discover cards violated Section 1 of the Act. *United States v. Visa U.S.A., Inc.*, 344 F.3d 229 (2d Cir. 2003) (affirming *United States v. Visa U.S.A., Inc.*, 163 F. Supp. 2d 322 (S.D.N.Y. 2001)).

The Defendants correctly observe that "[m]ere membership in associations is not enough to establish participation in a conspiracy with other members of those associations." *Fed. Prescription Serv., Inc. v. Am. Pharm. Ass'n*, 663 F.2d 253, 265 (D.C. Cir. 1981); *see also Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1048 (9th Cir. 2008) ("[M]embership in an association does not render an association's members automatically liable for antitrust violations committed by the association."). But the Plaintiffs here have done much more than allege "mere membership." They have alleged that the member banks *used* the bankcard associations to adopt and enforce a supracompetitive pricing regime for ATM access fees. *See, e.g.*, Osborn Prop. Compl. ¶ 81 ("The unreasonable restraints . . . originated in the rules of the former bankcard associations *agreed to by the banks themselves*.") (emphasis added); NAC Prop. Comp. ¶¶ 89-90 (alleging that member banks appointed representatives to the

bankcard associations' Boards of Directors, which in turn established the anticompetitive access fee rules, with the cooperation and assent of the member banks). That is enough to satisfy the plausibility standard.

Defendants next seek refuge in the fact that the banks reorganized MasterCard and Visa as publicly held corporations in 2006 and 2008, respectively. The Defendants contend that even if there had been agreements or conspiracies, the public offerings terminated them. *See* Appellees' Br. 40-41. In their view, the offering constituted a withdrawal by the member banks – and with that withdrawal, the cessation of any concerted action. The Rules that remained intact no longer represented an agreement by the member banks, but rather unilateral impositions by the bankcard associations themselves, over which the banks no longer had control.

To establish withdrawal, a defendant may show that it has taken "[a]ffirmative acts inconsistent with the object of the conspiracy and communicated in a manner reasonably calculated to reach co-conspirators." *United States v. U.S. Gypsum Co.*, 438 U.S. 422, 464 (1978); *accord Watson Carpet & Floor Covering, Inc. v. Mohawk Indus., Inc.*, 648 F.3d 452, 460 (6th Cir. 2011); *In re Brand Name Prescription Drugs Antitrust Litig.*, 123 F.3d 599, 616 (7th Cir. 1997). Even where a member of the conspiracy appears to sever ties with other co-conspirators, there is no withdrawal if that member continues to support or benefit from the agreement. *See United States v. Eisen*, 974 F.2d 246, 269 (2d Cir. 1992) (finding no withdrawal from conspiracy where defendant resigned from corrupt firm but continued to receive a portion of profits); *United States v. Antar*, 53 F.3d 568, 583 (3d Cir. 1995) (holding that resignation from conspiracy is insufficient if the defendant "continues to do acts in furtherance of the

conspiracy and continues to receive benefits from the conspiracy's operations"), *overruled on other grounds*, *Smith v. Berg*, 247 F.3d 532, 534 (3d Cir. 2001). Whether there was an effective withdrawal is typically a question of fact for the jury. *See United States v. Bafia*, 949 F.2d 1465, 1480 (7th Cir. 1991); *In re Cathode Ray Tube (CRT) Antitrust Litig.*, No. C-07-5944, 2014 WL 1091589, at *9 (N.D. Cal. Mar. 13, 2014) (noting that withdrawal generally "is a fact-sensitive affirmative defense").

According to the complaints, each member bank "knew and understood that it and each and every other member of the applicable network would agree or continue to agree to be bound" by the rules both before and after the public offerings. NAC Prop. Compl. ¶ 102. To support that allegation, the plaintiffs point out that the banks have continued to issue Visa- and MasterCard-branded cards and to comply with the Access Fee Rules at their own ATMs. *Id.* ¶¶ 101, 103. Furthermore, even though the banks no longer directly control Visa and MasterCard, the plaintiffs observe, the banks work with those associations to route more transactions over their networks. For example, at least some member banks offer single-bug cards so that independent ATM operators have no choice but to run those transactions over a high-cost network run by Visa or MasterCard. *See* Osborn Prop. Compl. ¶¶ 83-85 (alleging that Bank of America, Wells Fargo, and Chase struck deals with Visa to drop alternative networks); *id.* ¶ 87 (alleging that Capital One and Fifth Third banks offer MasterCard debit cards with no rival bugs on the back). Based on these allegations, a jury could no doubt conclude that, in so doing, the banks continue to protect Visa and MasterCard from price competition.

Plaintiffs also allege that several member banks continue to benefit indirectly from the Access Fee Rules. Because the

major banks still own shares in Visa and MasterCard, *see* NAC Prop. Compl ¶¶ 99-100; Osborn Prop. Compl. ¶¶ 116-117, it can be inferred that the banks reap some ongoing financial benefit from increased profits at Visa and MasterCard. And by removing any incentive for customers to demand multi-bugged debit cards, the banks are able to avoid competition with each other on network offerings attached to their cards. *See* NAC Prop. Compl. ¶ 105 (referring to "collusive agreement not to compete on the basis of the efficiency of each bank's ATM services").

We therefore reject the Defendants' assertion that the public offerings dispelled any hint of conspiracy. The Plaintiffs have adequately alleged an agreement that originated when the member banks owned and operated Visa and MasterCard and which continued even after the public offerings of those associations.[3]

In a final attempt to defeat the proposed complaints, the Defendants contend that even if the Plaintiffs have adequately pleaded standing and agreement, they have failed to state a claim because their allegations do not establish antitrust injury. Appellees' Br. 21-22; *see Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977) (defining antitrust injury as "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful."). The Defendants do not provide

---

[3] The Plaintiffs plead in the alternative that the Access Fee Rules constitute unlawful vertical conspiracies to restrain trade. *See* Osborn Prop. Compl. ¶¶ 155-170; NAC Prop. Compl. ¶¶ 125-134. Stoumbos puts forward an alternative theory that the rules stem from unlawful "hub-and-spoke" conspiracies. *See* Stoumbos Prop. Compl. ¶ 53. Because we conclude that the proposed amended complaints allege a horizontal conspiracy, we do not reach the question of whether Plaintiffs' alternative theories are tenable.

a meaningful argument as to why antitrust standing is not present here, where the Plaintiffs have alleged that the Access Fee Rules chill competition among network service providers, leading to artificially high access fees for consumers and artificially low margins for the Defendants. *See, e.g.*, NAC Prop. Compl. ¶ 108 (arguing that Defendants' anticompetitive conduct has forced the independent operators to pay supra-competitive network fees). We therefore decline Defendants' invitation to affirm on that basis.

### III.

For the foregoing reasons, we hold that the District Court erred in concluding that the Plaintiffs had failed to plead adequate facts to establish standing or the existence of a horizontal conspiracy to restrain trade. We therefore vacate the District Court's December 19 order denying the Plaintiffs' motion to amend the judgment, and we remand for further proceedings consistent with this opinion.[4]

*So ordered.*

---

[4] As futility was the sole ground articulated by the District Court for denying the Plaintiffs' motions to amend the judgment and to file amended complaints, we see no reason that the motions should not be granted on remand. *See Foman*, 371 U.S. at 181-82 (explaining that if "the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits"); *Ciralsky*, 355 F.3d at 672-73 (recognizing that it may be appropriate to convert a judgment that dismisses a case into an order dismissing a complaint for statute of limitations purpose). But we leave this discretionary decision to the district judge, *see Firestone*, 76 F.3d at 1208, whose view of the case is more nuanced than our own.