**Charlene EIKE, et al., on behalf of themselves and all others similarly situated, Plaintiffs–Appellees,**

**v.**

**ALLERGAN, INC., et al., Defendants–Appellants.**

No. 16-3334

United States Court of Appeals, Seventh Circuit.

Argued February 7, 2017

Decided March 6, 2017

Rehearing En Banc* Denied April 7, 2017

---

* Circuit Judge Ilana Rovner did not participate in the consideration of this petition for re-hearing.

Richard Steven Cornfeld, Attorney, Law Office of Richard S. Cornfeld, Kevin M. Carnie, Jr., Attorney, Simon Law Firm, St. Louis, MO, Leah M. Nicholls, Attorney, Public Justice, Washington, DC, for Plaintiffs–Appellees.

Troy A. Bozarth, Attorney, Hepler Broom, LLC, Edwardsville, IL, James P. Muehlberger, Attorney, Lori Connors McGroder, Attorney, Shook, Hardy & Bacon LLP, Kansas City, MO, for Defendant–Appellant Allergan, Inc.

Gregory E. Ostfeld, Attorney, Greenberg Traurig, LLP, Chicago, IL, for Defendant–Appellant Alcon Laboratories, Inc.

Robyn Eileen Bladow, Attorney, Kirkland & Ellis LLP, Los Angeles, CA, for Defendant–Appellant Pfizer, Incorporated.

Stephen G. Strauss, Attorney, Bryan Cave LLP, St. Louis, MO, for Defendant–Appellant Merck & Company, Incorporated.

Jeffrey S. Bucholtz, Attorney, King & Spalding LLP, Washington, DC, for Amici Curiae Chamber of Commerce of the United States of America, American Tort Reform Association.

Stephen Gardner, Attorney, Stanley Law Group, Dallas, TX, for Amicus Curiae National Association of Consumer Advocates, Incorporated.

Before BAUER, POSNER, and SYKES, Circuit Judges.

POSNER, Circuit Judge.

The defendants appeal from an order certifying eight classes (which for simplicity we'll pretend are just one class), consisting of persons in Illinois and Missouri who take eye drops manufactured by six pharmaceutical companies—the defendants in the case—for treatment of glaucoma. The claim is that the defendants' eye drops are unnecessarily large, in violation of the Illinois Consumer Fraud Act, 815 ILCS 505/1 et seq., and the Missouri Merchandising Practices Act, Mo. Rev. Stat. §§ 407.010 et seq., because each eye drop exceeds 16 microliters (equal to a tenth of one percent of a tablespoon), and the class contends that the optimal size of an eye drop for treatment of glaucoma is 16 microliters, no more. In places it says that drops as small as 5 microliters would be safe, but its claim is merely that anything larger than 16 microliters is wasteful because, it contends, the additional microliters add no therapeutic value.

The difference between the price per drop of the eye drops at their present size, and the presumably lower price if the drops were smaller, multiplied by the number of drops that have been bought by the members of the class, are the damages the class is seeking.

Yet it does not argue that the price of the current eye drops is a result of collusion, whether tacit or express, among the defendants; this is not an antitrust case. Nor is there any allegation of misrepresentation. The argument is only that the price of the eye drops is excessive because a smaller drop, costing less to produce and (especially) to package, could be sold at a lower price yet still cover the producers' costs, and therefore the only benefit of the larger drop is to the producers' profits,

which is why, the class argues, the producers are not motivated to make the change. This assumes that profits would decline if the defendants switched to selling the smaller, cheaper-to-produce eye drops. But that's far from certain; lower prices might result in greater sales and as a result higher rather than lower profits.

The class further alleges that the large eye drops have a higher risk of side effects—but does not explain what the side effects are—and are more likely to be used up faster. Yet there is no claim that members of the class have experienced side effects from the large drops, or have been harmed because they ran out of them early (on the theory that the larger the drops the fewer there are in each bottle). Unsurprisingly, therefore, the only damages sought are for the "pocketbook" injury of paying what the class contends to be an unnecessarily high price for the defendants' eye drops because of the size of those drops.

■ Given the lack of any suggestion of collusion by the defendants either with each other or with other producers (if there are other producers) of eye drops for treatment of glaucoma, or of any claim that the defendants misrepresent the quality of their product, we are asked to decide a case based simply on dissatisfaction with a product made by multiple firms, or with its price. Suppose the class members all happened to own pedigreed cats, and the breeders who had sold the cats to the class members had told them that as responsible cat owners they would have to feed the cats kibbles during the day and Fancy Feast at night and buy a fountain for each cat because cats prefer to drink out of a fountain (where gravity works for them) rather than out of a bowl (where gravity works against them) and they don't like to share a fountain with another cat. And suppose the buyers do as told, buying what they are told to buy from pet stores, but it turns out that the cats have large appetites, the cat food is quite expensive, and the fountains are expensive and not wholly reliable. The breeders had made no misrepresentations, concealed no information, answered all questions of prospective buyers truthfully. Nevertheless many of the buyers are dissatisfied. They think—maybe correctly—that the cat food is needlessly expensive and the fountain a fragile luxury. Yet would anyone think they could successfully sue the breeders? For what? The breeders had made no misrepresentations. Had a prospective buyer asked one of the breeders what the annual cost of maintaining the cat would be, the breeder would, let's assume, have given him a realistic estimate. There would be disappointment in the example given, but no cause of action.

It's the same here. The only eye drops sold by the defendants for the treatment of glaucoma are larger than 16 microliters. There are reasons for this, or so the defendants argue. Each eye drop consists mostly of inactive ingredients; the active pharmaceutical ingredient that is what treats the glaucoma is only about 1 percent of the drop, and only 1 to 7 percent of *that* ingredient crosses the cornea into the eye itself, where it can exert its therapeutic effect. The amount of fluid the eye can hold without overflowing varies from person to person and, the defendants assert, often exceeds 16 microliters. The smaller the drop, therefore, the weaker its likely therapeutic effect for patients whose eyes could have absorbed a larger drop. In addition, elderly patients, patients with unsteady hands, and patients who already have serious eye problems, often have trouble getting eye drops into their eyes, and the smaller the drop the likelier they are to miss.

■ The defendants' large eye drops have been approved by the Food and Drug Administration (FDA)—in other words have been determined to be safe and effective for treatment of glaucoma. That doesn't exclude the possibility that a smaller drop would be as or even more effective, and also cheaper. But those are matters for the class members to take up with the FDA. See 21 C.F.R. § 10.30. A court can review a determination by the FDA, but it cannot bypass the agency and make its own evaluation of the safety and efficacy of an unconventionally sized eye drop for treatment of glaucoma. Not that the class members are likely to get far with the FDA. They don't want the agency to rescind its approval of the large drops— they don't argue that the large drops are unsafe or ineffective. They just want the defendant companies to start manufacturing smaller drops. But the agency can't force a private company to manufacture a product the company doesn't want to make—all it can do is approve or disapprove drugs that a company does make.

■ Even supposing it were demonstrable that a smaller eye drop would be more effective and cheaper than the ones manufactured by the defendants, the class members would have no cause of action. You cannot sue a company and argue only—"it could do better by us"—which is all they are arguing. In fact, such a suit fails at the threshold, because there is no standing to sue. One cannot bring a suit in federal court without pleading that one has been injured in some way (physically, financially—whatever) by the defendant. That's what's required for standing. The fact that a seller does not sell the product that you want, or at the price you'd like to pay, is not an actionable injury; it is just a regret or disappointment—which is all we have here, the class having failed to allege "an invasion of a legally protected inter-

est." *Spokeo, Inc. v. Robins*, —— U.S. ——, 136 S.Ct. 1540, 1548, 194 L.Ed.2d 635 (2016); *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992).

And so the grant of class certification is vacated and the case remanded with directions to dismiss the suit with prejudice.