OPINION OF THE COURT RESTREPO, Circuit Judge In this putative class action, consumers of prescription eye medication allege that manufacturers and distributors of the medication packaged it in such a way that forced them to waste it, violating the consumer protection statutes of their home states. The District Court dismissed the entire action for lack of jurisdiction, finding the consumers’ allegations of injury in fact insufficient to confer standing. For the reasons that follow, we will reverse the dismissal, and remand the case for further consideration. I[1] Defendants are manufacturers and distributors of generic and brand-name prescription eye drop tetedications that áre approved by the Food and Drug Administration (“FDA”) to treat serious medical conditions such as glaucoma, a leading cause of blindness.[2] Defendants sell these prescription medications in fluid form and package the fluid in plastic bottles. Bottles are pre-packaged with a fixed volume of medication (e.g., 5.0 mL) sold at set prices. Labeling on the bottles does not indicate how many doses or days of treatment a patient will be able to extract from the bottle. Medication is dispensed from the plastic bottles into patients’ eyes in drop form. The dimensions of the bottle’s dropper tip dictate the size of the drop dispensed from that bottle, In effect, the larger the bottle dropper tip, the larger the drop dispensed. There is no reasonable way for a patient to instill less than one full drop into his or her eye, A- plethora of scientific research conducted over the last four decades has examined the drop size of Defendants’ medications; some of the studies conducted were, in fact, sponsored and published by Defendants. According to these studies, a normal adult’s inferior fornix—the area between‘the eye and the lower eyelid—has a capacity of approximatély 7 to 10 microliters (“p,Ls”) of fluid.[3] If a drop of medication exceeding that capacity is placed into an adult patient’s eye, excess medication is expelled. Expelled medication may run down a patient’s cheek, providing no pharmaceutical benefit to the patient whatsoever. This medication is “entirely wasted” by the patient. App. 182. Expelled medication also may flow into a patient’s tear ducts and move into his or her bloodstream. Medication entering a patient’s bloodstream may increase a patient’s risk of experiencing certain harmful systemic side effects. These studies conclude that eye drops should be 5 to 15 (xLs in order to maximize the amount of the medication entering the inner eye—the site of action for the medication. Drop sizes within this range minimize overflow “waste” and also minimize the risk of side effects. Despite the scientific consensus on drop size, all of Defendants’ products at issue emit drops that are considerably larger than 15 p,Ls. In fact, a 2008 study showed that each Defendant’s drop size was more than two to three times the 15 p,L maximum recommended size. Several Defendants sold products with drop sizes of 50 |xL. To put these data in perspective, at least half of every drop of medication dispensed from any one of Defendants’ product bottles goes to waste on a patient, and may put the patient at risk of side effects. Plaintiffs in this litigation are individuals who paid for Defendants’ eye drop medication. They allege that Defendants have control over the design and dimensions of the bottle dropper tip, and thus could reduce the size of drops emitted from their product bottles, but have chosen not to do so. Plaintiffs do not purport to have personal knowledge as to why no defendant has reduced their products’ drop sizes. However, Plaintiffs include in the Amended Complaint allegations that senior executives at Defendant Alcon explained to a consultant working with them that they were unwilling to reduce drop sizes because if they did, the company “would sell less product and make less money.” App. 244. Plaintiffs aver that Defendants’ practices of selling medication in bottles that emit such large drops caused them “substantial” economic injury. App. 214. Specifically, Plaintiffs allege, “If the sizes of Defendants’ prescription eye drops were limited to the maximum effective size of 15 |xL ... the medication in the bottles would last longer and [Plaintiffs] would spend substantially less on their therapy than they do with larger, substantially wasted, eye drops.” App. 214. Plaintiffs illustrated this point in their Amended Complaint with an example provided in a 2008 scientific study: [T]he average drop size for Allergan’s glaucoma drug Alphagan P ... in a 5 mL bottle was 43 |xL.... At the recommended dose of one drop in each affected eye three times daily, a 5 mL bottle would last a patient with bilateral glaucoma 20 days. That patient would go through 18.25 bottles in a year. In July 2013, a 5 mL bottle of Alphagan P ... cost $104.99. A year’s course of treatment would therefore cost approximately $1,915. However, approximately 65% of the medication, the amount over 15 jjlL, would be wasted. If the drops had been only 15 |xL, the patient would have needed only 6.46 bottles a year, or 7.0 bottles if the drops had been 16 |xL.... The unneeded medication would cost the patient more than $1,100 a year. App. 215-216 (emphasis added). Plaintiffs also quantified their individual economic injuries in charts attached to the Amended Complaint. Plaintiffs claim they could not have avoided these economic injuries; they were “compelled] [by Defendants’ practices] to spend more money on their therapy than if the drops were 15 (xL.” App. 214. They had no non-pharmaceutical alternative treatments for their conditions. And there were no alternative products to Defendants’; “all prescription eye drops are substantially larger than 15 |xL and therefore lead to wastage.” App. 217. Their only alternative was to forgo treatment and risk blindness or worsening eyesight. II In September 2014, Plaintiffs filed a putative class action complaint, on behalf of themselves and other similarly situated parties, in the United States District Court for the District of New Jersey. Plaintiffs asserted violations of the consumer protection laws of their respective home states: the New Jersey Consumer Fraud Act (“NJCFA”), N.J.SA. § 56:8-1, et seq.; the California Unfair Competition Law (“UCL”), Cal. Bus. Prof. Code § 17200, et seq.; the Florida Deceptive and Unfair Trade Practices Act (“FDUTPA”), Fla. Stat. § 501.201, et seq.; the Illinois Consumer Fraud Act (“ICFA”), 815 ILCS 505/1, et seq.; the North Carolina Unfair and Deceptive Trade Practices Act (“NCUDTPA”), N.C.G.S. § 75-1.1, et seq.; and the Texas Deceptive Trade Practices Act (“DTPA”), Tex. Bus. & Com. Code § 17.41, et seq. Plaintiffs claimed Defendants’ practices in manufacturing and selling prescription eye drop medication violated the statutes’ prohibitions on unfair or unconscionable trade practices. The District Court dismissed Plaintiffs’ original complaint for lack of standing, without prejudice to Plaintiffs’ ability to amend the complaint and cure the standing deficiencies. In June 2015, Plaintiffs filed an Amended Complaint, asserting claims of unfair or unconscionable practices under the same six state consumer protection statutes.[4] Plaintiffs supported their allegations of unfair or unconscionable practices with: (a) scientific literature opining on costs savings occasioned by utilizing smaller drop sizes; and (b) charts showing each Plaintiffs expenses. The charts detañed Plaintiffs’ medication purchases and the out-of-pocket expenses they incurred for their purchases. Using these charts and information about each product’s drop size, Plaintiffs calculated their total out-of-pocket payments on “wasted” medication. These totals ranged from a few dollars to a few hundred dollars. In August 2015, Defendants moved to dismiss Plaintiffs’ Amended Complaint for lack of standing, federal preemption, and failure to state a claim. The District Court granted Defendants’ motions, finding that Plaintiffs had not pleaded an injury in fact necessary to confer standing. As a result, the court did not reach Defendants’ arguments on preemption and the sufficiency of Plaintiffs’ claims under Federal Rule of Civil Procedure 12(b)(6). Plaintiffs then filed this timely appeal. III The District Court had jurisdiction pursuant to the Class Action Fairness Act (“CAFA”), 28 U.S.C. § 1332(d), because at least one member of the Plaintiff class is diverse from at least one of the Defendants, the putative class is composed of at least 100 people, and the amount in controversy exceeds five million dollars. We have jurisdiction over the District Court’s dismissal of the case pursuant to 28 U.S.C. § 1291. We exercise plenary review over a dismissal for lack of standing. In re Schering Plough Corp. Intron/Temodar Consumer Class Action, 678 F.3d 235, 243 (3d Cir. 2012). IV Article III of the United States Constitution limits the power of the federal judiciary to “cases” and “controversies.” U.S. Const. art. III. For a federal court to exercise jurisdiction under Article III, plaintiffs must allege—and eventually prove—that they having “standing” to pursue their claims. See Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). The'doctrine of standing emerged from “the traditional understanding of a case or controversy” in order “to ensure that federal courts do not exceed their [constitutional] authority” by “unsurp[ing] the powers of the political branches.” Spokeo, Inc. v. Robins, — U.S. —, 136 S.Ct. 1540, 1547, 194 L.Ed.2d 635 (2016) (quoting Clapper v. Amnesty Int’l USA, 568 U.S. 398, 133 S.Ct. 1138, 1146, 185 L.Ed.2d 264 (2013)). “The doctrine limits the category of litigants empowered to maintain a lawsuit in federal court to seek redress for a legal wrong.” Id. The plaintiff, “as the party invoking federal jurisdiction,” bears the burden of establishing the minimal requirements of Article III standing: “(1) ... an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision.”[5] Id. In assessing whether a plaintiff has carried.this burden, we separate our standing inquiry from any assessment of the merits of the plaintiffs claim. To maintain this fundamental separation between standing and merits at the dismissal stage, we assume for the purposes of our standing inquiry that a plaintiff has stated valid legal claims. Info. Handling Servs., Inc. v. Defense Automated Printing Servs., 338 F.3d 1024, 1029 (D.C. Cir. 2003) (citing Warth v. Seldin, 422 U.S. 490, 500, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975)). While our standing inquiry may necessarily reference the “nature and source of the daim[s] asserted,” Warth, 422 U.S. at 500, 95 S.Ct. 2197, our focus remains on whether the plaintiff is the proper party to bring those claims, The Pitt News v. Fisher, 215 F.3d 354, 360 (3d Cir. 2000); White Tail Park, Inc. v. Stroube, 413 F.3d 451, 460-61 (4th Cir. 2005). A This case centers on the “[fjirst and foremost” of the three standing elements, injury in fact. Spokeo, 136 S.Ct. at 1547 (quoting Steel Co. v. Citizens for a Better Env’t, 523 U.S. 83, 103, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998)). The purpose of the injury-in-fact requirement, the Supreme Court has explained, is “to distinguish a person with a direct stake in the outcome of. a litigation—even . though small—from a person with a mere interest in the problem.” United States v. Students Challenging Regulatory Agency Procedures (SCRAP), 412 U.S. 669, 689 n.14, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973). Put differently, the requirement serves to filter out those “with merely generalized grievances” who are “bringing suit to vindicate an interest common to the entire public.” Friends of the Earth, Inc. v. Gaston Copper Recycling Corp., 204 F.3d 149, 156 (4th Cir. 2000). The injury-in-fact requirement is “very generous” to claimants, demanding only that the claimant “allege[ ] some specific, ‘identifiable trifle’ of.injury.” Bowman v. Wilson, 672 F.2d 1145, 1151 (3d Cir. 1982) (quoting SCRAP, 412 U.S. at 686-90 & 689 n.14, 93 S.Ct. 2405). It “is not Mount Everest.” Danvers, 432 F.3d at 294. To allege injury in fact sufficiently, a plaintiff must claim “that he or she suffered ‘an invasion of a legally protected interest’ that is ‘concrete and particularized’ and ‘actual or imminent, not conjectural or hypothetical.’ ” Spokeo, 136 S.Ct. at 1548 (quoting Lujan, 504 U.S. at 560, 112 S.Ct. 2130). Typically, a plaintiffs allegations of financial harm will easily satisfy each of these components, as financial harm is a “classic” and “paradigmatic form[ ]” of. injury in fact, Danvers, 432 F.3d at 291, 293. Indeed, we have explained that where a plaintiff alleges financial harm, standing “is often assumed without discussion.” Id. at 293; see also Carter v. HealthPort Techs., LLC, 822 F.3d 47, 55 (2d Cir. 2016) (“Any monetary loss suffered by the plaintiff satisfies [the injury-in-fact] element; ‘[e]ven a small financial loss’ suffices.” (quoting Nat. Res. Def. Council, Inc. v. U.S. Food & Drug Admin., 710 F.3d 71, 85 (2d Cir. 2013))); Cent. Ariz. Water Conservation Dist. v. U.S. E.P.A., 990 F.2d 1531, 1537 (3d Cir. 1993) (“Pecuniary injury is clearly a sufficient basis for standing.” (internal quotation marks and citation omitted)). Although the District Court provided a detailed recitation of standing law in its opinion, including the components of injury in fact, it did not apply those individual components to Plaintiffs’ allegations. Rather, it framed its injury-in-fact analysis around broader principles and theories of standing, as did the parties in their briefing to this Court/ This approach has some persuasive appeal. But where the court or litigants cast aside the essential components of injury in-fact in-favor of more generalized, abstract discussion, they risk improperly, if inadvertently, crossing over in their analysis from standing to merits. So we take a different tack; we, will address in turn each component of injury in fact. 1 The first component of the injury-in-fact test offered by Spokeo—“legally protected interests”—warrants the most discussion in this case. The Supreme Court has not defined the term “legally protected interest” as it pertains to Article III standing, nor has it clarified whether the term does any independent work in the standing analysis. The Court first introduced the term in Lujan, 504 U.S. at 560, 112 S.Ct. 2130; see Judicial Watch, Inc. v. U.S. Senate, 432 F.3d 359, 363 (D.C. Cir. 2005) (Williams, J., concurring). And it appeared—without elaboration—as recently as last year in Spokeo in the Court’s recitation of Lujan’s injury-in fact test. 136 S.Ct. at 1548. Between Lujan and Spokeo though, it has not appeared with regularity in Supreme Court opinions addressing standing. A host of the Court’s standing opinions have omitted the term altogether,[6] and it has rarely been applied. See Judicial Watch, 432 F.3d at 363 (Williams, J., concurring). This may suggest that “legally protected interest” is simply a reformulation of the other components of injury in fact. Id. However, if we assume ar-guendo that the term “do[es] some work in the standing analysis,” Initiative & Referendum Inst. v. Walker, 450 F.3d 1082, 1093 (10th Cir. 2006) (en banc), we can discern a number of guideposts from the Supreme Court’s standing jurisprudence about what it may—and may not—require that bear on this case. The most important is this: in this context, whether a plaintiff has alleged an invasion of a “legally protected interest” does not hinge on whether the conduct alleged to violate a statute does, as a matter of law, violate the statute. Were we to conclude otherwise, we would effectively collapse our evaluation under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim into an Article III standing evaluation. Every losing claim would be dismissed—without prejudice[7]—for lacking standing in the first place. Id. at 1092; White Tail Park, 413 F.3d at 460-61; Claybrook v. Slater, 111 F.3d 904, 907 (D.C. Cir. 1997); see also In re Special Grand Jury 89-2, 450 F.3d 1159, 1172 (10th Cir. 2006) (observing that the Supreme Court “has made clear that a plaintiff can have standing ... even though the interest would not be protected by the law in that case”). And we would “thwart a major function of the standing doctrine—to avoid premature judicial involvement in resolution of issues on the merits.” Judicial Watch, 432 F.3d at 364 (Williams, J., concurring). Second, the Supreme Court has repeatedly recognized that financial or economic interests are “legally protected interests” for purposes of the standing doctrine. See Vermont Agency of Nat. Resources v. United States, 529 U.S. 765, 772-77, 120 S.Ct. 1858, 146 L.Ed.2d 836 (2000); Clinton v. New York, 524 U.S. 417, 432, 118 S.Ct. 2091, 141 L.Ed.2d 393 (1998); Sierra Club v. Morton, 405 U.S. 727, 733-34, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972); see also Cent. Ariz. Water, 990 F.2d at 1537 (stating that “pecuniary or economic injury is generally a legally protected interest,” so long as that economic injury meets the remaining requirements of the injury-in-fact test); Erwin Chemerinsky, Federal Jurisdiction § 2.3, at 76 (7th ed. 2016) (noting that the Supreme Court has deemed economic harms sufficient injuries for standing). Third, “legally protected interests” may arise from the Constitution, from common law, or “solely by virtue of ‘statutes creating legal rights, the invasion of which creates standing.’” Lujan, 504 U.S. at 576-78, 112 S.Ct. 2130 (quoting Warth, 422 U.S. at 500, 95 S.Ct. 2197). Both federal law and state law—including state statutes—“can create interests that support standing in federal courts.” Cantrell v. City of Long Beach, 241 F.3d 674, 684 (9th Cir. 2001) (citing FMC Corp. v. Boesky, 852 F.2d 981, 992 (7th Cir. 1988)). Fourth, the interest asserted must be “related to the injury in fact”; it cannot be “merely a ‘byproduct’ of the suit itself.” Vermont Agency, 529 U.S. at 772-73, 120 S.Ct. 1858. To illustrate, a qui tarn relator who is entitled to a portion of a recovery if his suit under the False Claims Act is successful has a legally protected interest in the outcome of the suit. Id. at 772, 120 S.Ct. 1858. An individual who has simply placed a wager on the outcome does not. Id.; see also Steel Co., 523 U.S. at 107, 118 S.Ct. 1003 (“[A] plaintiff cannot achieve standing to litigate a substantive issue by bringing suit for the cost of bringing suit”). With these guideposts in mind, we look to Plaintiffs’ Amended Complaint. Plaintiffs claim economic interests: interests in the money they had to spend on medication that was impossible for them to use. They seek monetary compensation for Defendants’ conduct that they allege caused harm to these interests. Plaintiffs’ claimed interests arise from state consumer protection statutes that provide monetary relief to private individuals who are damaged by business practices that violate those statutes. These claims fit comfortably in categories of “legally protected interests” readily recognized by federal courts. See Cantrell, 241 F.3d at 684. We acknowledge that the Seventh Circuit held otherwise in a recent case concerning materially identical allegations against many of the same defendants. Eike v. Allergan, Inc., 850 F.3d 315 (7th Cir. 2017). In reviewing the defendants’ appeal from the district court’s grant of class certification, the Seventh Circuit concluded that plaintiffs had failed to allege a “legally protected interest,” and therefore, lacked standing. Id. at 318. The Court noted that the Plaintiffs’ pleading “lack[ed] ... any suggestion of collusion ... or any claim” of misrepresentation or deception by defendants. Id. at 317. From the absence of fraud-based allegations, the court went on to reason that the plaintiffs’ claims were necessarily “based simply on [their] dissatisfaction” with the defendants’ products or their prices. Id. at 317. We decline to adopt the Court’s rationale. This reasoning fails to recognize a category of business practices entirely separate from practices that are fraudulent, deceptive, or misleading—-“unfair” business practices—prohibited under the state consumer protection statutes invoked. The plaintiffs in Eike explicitly alleged that the defendants’ practices in manufacturing and selling eye medication were “unfair” under the Illinois Consumer Fraud & Deceptive Practices Act (“ICFA”) and the Missouri Merchandising Practices Act (“MMPA”). See Eike v. Allergan, Inc., 2014 WL 1040728, at *1 (S.D. Ill. Mar. 18, 2014), vacated, 850 F.3d 315 (7th Cir. 2017).[8] The Court was obliged to take these allegations as true for purposes of the standing inquiry. Yet nowhere in its opinion does the term “unfair” even appear. See generally Eike, 850 F.3d 315. Even setting aside the difference between “deceptive” and “unfair” practices under the state consumer protection statutes, the Court in Eike blended standing and merits together in a manner that the Supreme Court has exhaustively cautioned courts against. The Seventh Circuit seemed to begin its standing analysis with a determination that the plaintiffs had “no cause of action.” Id. at 317-18. Because they had no cause of action, the Court reasoned, they had no injury. Id. at 318. Because they had no injury, they had no standing to sue. Id. This logic flips the standing inquiry inside out, morphing it into a test of the legal validity of the plaintiffs’ claims of unlawful conduct. But as we have already emphasized, a valid claim for relief is not a prerequisite for standing. Steel Co., 523 U.S. at 96, 118 S.Ct. 1003 (explaining that “the nonexistence of a cause of action was no proper basis for a jurisdictional dismissal” and highlighting the “fundamental distinction between arguing” that plaintiffs have no cause of action and arguing that they do not have Article III standing); see also Bond v. United States, 564 U.S. 211, 218-19, 131 S.Ct. 2355, 180 L.Ed.2d 269 (2011) (noting the distinction between whether a plaintiff has a “cause of action” and whether he or she has “standing”). Indeed, the Seventh Circuit has acknowledged as much in other cases. For instance, in Bruggeman ex rel. Bruggeman v. Blagojevich, 324 F.3d 906 (7th Cir. 2003), it faulted the district court for finding that the plaintiffs, had no standing to pursue their claims against state officials for violations. of a federal statute. Id. at 908-09. There, it explained: The district judge ruled that none of [the relevant statutory provisions] entitled the plaintiffs to what they were seeking and that therefore the plaintiffs .had not been .injured by a violation of the statute and so lacked standing to sue. This is a misunderstanding of standing. A plaintiff has standing to sue—that is, he can invoke the jurisdiction of the court—if he is tangibly, materially, injured by the conduct of the defendant that he claims is unlawful,... [I]f the consequence [of his claim lacking merit] were that he lacked standing, then every decision in favor of a defendant would be a decision that the court lacked jurisdiction, entitling the plaintiff to start over in another court. Id. at 909. The District Court here, like the Seventh Circuit, cast the Plaintiffs’ allegations as mere grumblings that Defendants’ products were priced too high or packaged inefficiently, because the allegations lacked notes of fraud, deception, or misrepresentation. But as in Eike, the absence of fraud allegations in the Amended Complaint was purposeful; Plaintiffs claim that Defendants’ practices were unfair and unconscionable, not deceptive or fraudulent. And like the statutes at issue in Eike, the statutes enumerated in Plaintiffs’ Amended Complaint prohibit business practices that are “unfair” or “unconscionable” in. addition to practices that are fraudulent, deceptive, or misleading; these terms are defined separately and differently in the text of the-.statutes and in relevant case law interpreting them.[9] Therefore, the District Court’s characterization of Plaintiffs’ claims as “sound[ing] in fraud” was inaccurate, and the conclusion that Plaintiffs were without standing due, in part, to the absence of theories of injury “normally attendant to consumer fraud claims,” App. 23, misses the mark. Moreover, the District Court’s chain of reasoning—that because Plaintiffs made no allegations of fraud, they suffered no injury, and therefore had no standing to sue—blends standing with merits in the same manner as Eike. For these reasons, we conclude that Plaintiffs have sufficiently alleged “legally protected interests.” 2 We turn to the next component of injury in fact: concreteness. For an injury to be “concrete,” it must be “real” and “actually exist”; it cannot be “abstract.” Spokeo, 136 S.Ct. at 1548 (internal citations omitted). Bare procedural or technical violations of a statute alone will not satisfy the concreteness requirement. Id. at 1549; see also Allen v. Wright, 468 U.S. 737, 754, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984) (“[A]n asserted right to have the Government act in accordance with law is not sufficient, standing alone, to confer jurisdiction on a federal court.”), abrogated on other grounds by Lexmark Int’l, Inc. v. Static Control Components, Inc., — U.S. —, 134 S.Ct. 1377, 188 L.Ed.2d 392 (2014). Here, Plaintiffs do not simply allege that Defendants’ practices violated state consumer protection statutes. They allege that those violations caused each of them tangible, economic harm. This satisfies the concreteness requirement. 3 An injury must be both concrete and particularized; these are distinct components of injury in fact. Spokeo, 136 S.Ct. at 1548. “For an injury to be ‘particularized,’ it ‘must affect the plaintiff in a personal and individual way.’ ” Id. at 1548; see also In re Schering Plough, 678 F.3d at 245 (noting that the party seeking review must be “himself nmong the injured” (quoting Lujan, 504 U.S. at 560, 112 S.Ct. 2130)); The Pitt News, 215 F.3d at 360. Although “[generalized grievances” common to the public will not suffice, Knick v. Twp. of Scott, 862 F.3d 310, 318 (3d Cir. 2017), “[t]he fact that an injury may be suffered by a large number of people does not of itself make that injury a nonjusticiable generalized grievance,” Spokeo, 136 S.Ct. at 1548 n.7. Requiring a plaintiff to allege facts establishing he is personally injured by a defendant’s conduct places “the decision as to whether review will be sought in the hands of those who have a direct stake in the outcome.” Sierra Club v. Morton, 405 U.S. 727, 740, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972). Here, each Plaintiff alleges financial harm that he or she has personally incurred in purchasing medication that was impossible for him or her to use. There can be no dispute that this harm is particularized. 4 Finally, we must determine whether Plaintiffs’ alleged injuries are “actual or imminent” rather than merely “conjectural or hypothetical.” Spokeo, 136 S.Ct. at 1548. This component of injury-in-fact is designed to separate those plaintiffs who have alleged “that [they] ha[ve] been or will in fact be perceptibly harmed by the challenged [defendants’] action” from those who claim only that they “can imagine circumstances in which [they] could be affected by the [defendant’s] action.” SCRAP, 412 U.S. at 688-89, 93 S.Ct. 2405. Plaintiffs’ “pleadings must be something more than an ingenious academic exercise in the conceivable.” Id. Plaintiffs attempt to measure their financial harm by way of two “theories” outlined in their Amended Complaint: (1) the cost differential between what they would have paid for their course of medication from smaller tipped bottles and what they actually paid for the larger tipped bottles (the “pricing theory”); or (2) the total overflow from each drop administered that was impossible for them to use (the “reimbursement theory”). These are two ways of calculating the same thing: the cost of “wasted” medication that Plaintiffs allege they were compelled to purchase but could not use. Under both theories, the total financial harm works out to be the same. And under both theories, Plaintiffs’ claimed financial harm has already occurred, it is not merely possible, or even probable. So there is no question of adequate imminence in this case. See Adarand Constructors, Inc. v. Pena, 515 U.S. 200, 210, 115 S.Ct. 2097, 132 L.Ed.2d 158 (1995) (noting that the plaintiff “of course” had standing to seek damages for alleged past economic injury, as opposed to alleged risks of future injuries); Lewert v. P.F. Chang’s China Bistro, Inc., 819 F.3d 963, 966-97 (7th Cir. 2016); Maya v. Centex Corp., 658 F.3d 1060, 1069 (9th Cir. 2011) (“Allegedly, plaintiffs spent money that, absent defendants’ actions, they would not have spent.... This is a quintessential injury-in-fact.”). Despite this, the District Court rejected Plaintiffs’ “pricing theory” of “actual” harm as too speculative to support standing in this case. The District Court interpreted Plaintiffs’ pricing theory to rely on two critical presumptions: (a) Defendants would have reduced the volume of medication in each bottle to correspond with the lower volume of medication needed for a patient’s course of therapy; and (b) Defendants would have reduced the price of a bottle of medication in accordance with the reduction in volume. It rejected the second premise, because it had “no way of knowing whether Defendants would price their products [based on volume], particularly since the pricing of pharmaceuticals is complex.” App. 20-21. We might be inclined to agree with the District Court that the pricing theory was too speculative if it, in fact, had depended on these presumptions. But it did not. Plaintiffs alleged under the pricing theory that smaller tipped bottles would lower the cost of their medication treatment regimen. Treatment costs could have been lowered in several ways, only one of which involved lowering the actual price of the bottle of medication. Alternatively, Plaintiffs would have paid less for their course of medication if they were able to extract more doses of medication—at least twice as many doses, according to the allegations—out of the same bottle, without any changes from the status quo in bottle pricing, physicians’ prescribing practices, or the volume of medication in each bottle. Plaintiffs illustrated in the Amended Complaint how smaller tipped bottles would reduce the number of bottles needed for a one-year therapy regimen, and the resulting cost savings, by referencing an example in a 2008 scientific study, as detailed supra.[10] Plaintiffs also supported this iteration of the pricing theory by citing to numerous other scientific studies in the Amended Complaint. See, e.g., App. 240 (noting that “[o]bviously a smaller drop size would mean that more doses could be dispensed from each bottle of medication, providing cost savings to patients and managed care providers” (quoting Richard Fiscella et al., Efficiency of Instillation Methods for Prostaglandin Medications, 22 J. Ocular Pharmacology and Therapeutics 477, 478 (2006))). This alternative iteration of the pricing theory is far less speculative than the iteration of the pricing theory that the District Court understood Plaintiffs to be advancing. It is also far less speculative than the theory of financial harm we rejected in Finkelman v. Nat’l Football League, 810 F.3d 187 (3d Cir. 2016), the primary case on which the District Court relied here. In Finkelman, one plaintiff alleged that the National Football League’s (“NFL”) policy on distributing Superbowl tickets forced him to pay more for his ticket in the resale market than he otherwise would have. Id. at 190-91, 199-200. Under the NFL Superbowl ticket policy, 99% of the game tickets were distributed to NFL insiders, rather than sold to the public at-large. The plaintiff claimed that this policy reduced the number of tickets available in the resale market. Id. Under the basic economic principle of supply and demand then, the policy resulted in an inflated ticket price in the resale market, according to the plaintiff. Id. at 199-200. We rejected plaintiffs theory, as the plaintiff pled no facts to support their assertion -that the NFL’s policy would actually reduce the number of tickets in the resale market, since League insiders had the same incentives to resell their tickets for a large profit as the public at-large. Id. at 200-02. The alternative iteration of Plaintiffs’ pricing theory does not depend on a comparable presumption essential to their allegations of financial harm. As explained, the reduced size of the bottle dropper tip is the only change from the status quo. Accordingly, we find the pricing theory sufficient to satisfy the injury-in-fact requirement. Even if we had agreed that the pricing theory was too speculative to confer standing, the District Court did not appear to have the same concern about the reimbursement theory. Rather, the District Court rejected the reimbursement theory because it was not a theory of injury that previously had been recognized in fraud cases. Fraud cases, and the theories of injury recognized in those cases, are inap-posite here for the reasons explained above. Plaintiffs’ allegations concern unfairness and unconscionability. Therefore, under either theory, Plaintiffs’ harm is “actual” and satisfies this final component of injury in fact. * * * Having found Plaintiffs to sufficiently allege in their Amended Complaint the “ ‘invasion of a legally protected interest’ that is ‘concrete and particularized’ and ‘actual or imminent, not conjectural or hypothetical,’ ” Spokeo, 136 S.Ct. at 1548 (quoting Lujan, 504 U.S. at 560, 112 S.Ct. 2130), we hold that Plaintiffs have alleged an injury in fact sufficient to confer Article III standing to challenge Defendants’ allegedly unfair-business practices under the enumerated state consumer protection statutes. Of course, it could be that the District Court’s legal interpretation of those statutes will not protect against the complained-of business practices and thus will not provide Plaintiffs with the relief they seek. But that,question goes to the merits of Plaintiffs’ claims under the law, and should be tested through Defendants’ motion to dismiss for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6).[11] The District Court did not reach Defendants’ Rule 12(b)(6) arguments in this case. So that question is for another day. For the reasons already discussed, we will not require Plaintiffs to prove Defendants’ business practices are unfair under state consumer protection statutes in order to find that they have standing to level those attacks in the first place. La. Energy and Power Authority v. Fed. Energy Regulatory Comm’n, 141 F.3d 364, 368 (D.C. Cir. 1998). B Defendants Falcon, Sandoz, and Akorn, the generic manufacturers, contend that evep if we find that Plaintiffs have standing to pursue their claims, we should affirm the dismissal of their Amended Complaint on an alternative ground: because théir claims are preempted by federal law. Specifically, these Defendants contend they cannot unilaterally make changes to their products’ bottle droppers without FDA approval, because a change to th,e dropper would be considered “major,” and all “major? changes require FDA approval to take, effect. Therefore, they argue, federal impossibility preemption is appropriate, since they could not simultaneously. comply with FDA requirements and with state consumer protection laws that required them to manufacturer bottles with smaller tips,[12] Further, these Defendants argue that claims against generic manufacturers should he preempted because FDA regulations require generic products to have the same bottle design as their brand name equivalents. Plaintiffs argue in response that some manufacturers have .changed their drop volumes over time without FDA approval, which suggests FDA approval is unnecessary. Plaintiffs also argue that there is no same-size-drop equivalence requirement between brand name and generic manufacturers, as reflected by the fact that drop sizes differ between these manufacturers already. The District Court did not reach preemption in this case, having found that Plaintiffs lacked standing to pursue their claims. We decline to address it in the first instance on appeal,, as the record before us is not adequately developed to evaluate the parties’ arguments. V For the foregoing reasons, we will reverse the District Court’s dismissal of this action and remand for further proceedings consistent with this opinion. . "When reviewing an order of dismissal for lack of standing, we accept as true all material allegations of the complaint and construe them in favor of the plaintiff.” Danvers Motor Co., Inc. v. Ford Motor Co,, 432 F.3d 286, 288 (3d Cir. 2005) (quoting Conte Bros. Auto., Inc. v. Quaker State-Slick 50, Inc., 165 F.3d 221, 224 (3d Cir. 1998)). We therefore will review the facts as alleged by Plaintiffs in their operative complaint. See id. . As detailed in the District Court’s opinion, the defendants in this case include both brand-name and generic pharmaceutical manufacturers and their distributors. The brand name companies include: Alcon Laboratories, Inc., Alcon Research, Ltd., Allergan, Inc., Allergan USA, Inc., Allergan Sales, LLC, Pfizer Inc., Valeant Pharmaceuticals International, Inc,, Bausch & Lomb, Inc., Atom Phar-ma, Inc., Merck & Co., Inc., and Merck, Sharpe & Dohme Corp. The generic companies are Falcon Pharmaceuticals, Ltd., San-doz Inc., Prasco LLC, and Akorn, Inc. .It can hold 20 to 30 (LLs of fluid only for a moment, until the individual blinks. . Specifically, Plaintiffs claim that Defendants’ practices were: (1) "unconscionable commercial practice^]” under the NJCFA; (2) "unlawful” and “unfair” practices under the UCL; (3) "unfair acts or practices” under the FDUTPA; (4) "unfair acts or practices” under the ICFA; (5) "unfair ... acts or practices” under the NCUDTPA; (6) and "unconscionable act[s]” under the DTPA. App. 266-73 (internal quotation marks and citations omitted). . "In the context of class actions, Article III standing 'is determined vis-a-vis the named parties.’ ” McCray v. Fidelity Nat. Title Ins. Co., 682 F.3d 229, 243 (3d Cir. 2012) (quoting Krell v. Prudential Ins. Co. of Am., 148 F.3d 306 (3d Cir. 1998)). . See, e.g., Clapper, 568 U.S. at 409, 133 S.Ct. 1138 (stating "an injury must be concrete, particularized, and actual or imminent” (internal quotation marks omitted)); Monsanto Co. v. Geertson Seed Farms, 561 U.S, 139, 149, 130 S.Ct. 2743, 177 L.Ed.2d 461 (2010) ("Standing under Article III of the Constitution requires that an injury be concrete, particularized, and actual or imminent....”); Massachusetts v. U.S. E.P.A., 549 U.S. 497, 517, 127 S.Ct. 1438, 167 L.Ed.2d 248 (2007) (formulating the Lujan injury-in-fact test as requiring "a litigant [to] demonstrate that it has suffered a concrete and' particularized injury that is either actual or imminent”); Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 180, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000) ("In Lujan[, 504 U.S. at 560-61, 112 S.Ct. 2130], we held that, to satisfy Article Ill’s standing requirements, a plaintiff must show (1) it has suffered an ‘injury in fact’ that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical....”); Steel Co., 523 U.S. at 103, 118 S.Ct. 1003 (describing an injury in fact as "a harm suffered by the plaintiff that is concrete and actual or imminent, not conjectural or hypothetical” (internal quotation marks and citation omitted)), . Because the absence of standing leaves the court without subject matter jurisdiction to reach a decision on the merits, dismissals “with prejudice” for lack of standing are generally improper. See Korvettes, Inc. v. Brous, 617 F.2d 1021, 1024 (3d Cir. 1980). . Under the ICFA, “[a] plaintiff is entitled to recovery ... when there is unfair or deceptive conduct” and "may allege that conduct is unfair ... without alleging that the conduct is deceptive." Siegel v. Shell Oil Co., 612 F.3d 932, 935 (7th Cir. 2010) (emphasis added). Under the MMPA, "[t]he act ... by any person of any deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale ... of any merchandise ... is declared to be an unlawful practice.” Mo. Rev. Stat. § 407.020 (emphasis added). The definition of "unfair” under the MMPA is "unrestricted, all-encompassing, and exceedingly broad.” Conway v. CitiMortgage, Inc., 438 S.W.3d 410, 416 (Mo. 2014) (citation omitted). . See Rubio v. Capital One Bank, 613 F.3d 1195, 1203 (9th Cir, 2010) ("A business act or practice may violate the [UCL] if it is either unlawful, unfair, or fraudulent. Each of these three adjectives captures a separate and distinct theory-’of liability.” (internal quotation marks and citation omitted)); Siegel, 612 F.3d at 935 (7th Cir. 2010) (stating that "[a] plaintiff is entitled to recovery under [the] 1CFA when there is unfair or deceptive conduct” and "may allege that conduct is unfair ... without- alleging that the conduct is deceptive”); PNR, Inc, v. Beacon Property Mgmt., Inc., 842 So.2d 773, 777 (Fla. 2003) (defining an "unfair practice” under the FDUTPA as "one that offends established public policy and one that is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers”, and noting a separate definition for- "deception” (internal quotation marks and citation omitted)); Cox v. Sears Roebuck & Co., 138 N.J. 2, 647 A.2d 454, 462 (1994) (explaining that an unconscionable practice can qualify as unlawful under the NJCFA, “even if no-person was in fact misled or deceived thereby”); Lon Smith & Assocs., Inc. v. Key, 527 S.W.3d 604, 623, 2017 WL 3298391, at *11 (Tex. Ct. App. Aug 3, 2017) ("The DTPA defines '[u]nconscionable action or course of action' as 'an act or practice which, to a consumer’s detriment, takes advantage of the lack of knowledge, ability, experience, or capacity of the consumer to a grossly unfair degree.’ ” (quoting Tex. Bus. & Comm. Code Ann. § 17.45(5))); Melton v. Family First Mortg. Corp., 156 N.C.App., 129, 576 S.E.2d 365, 368 (2003) ("A practice is unfair [under the NCUDTPA] when it offends established public policy as well as when the practice is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers” and offering a separate definition for "deceptive” practices (internal quotation marks and citations omitted)). . Further, Plaintiffs clearly articulated this theory in their briefing to the District Court opposing Defendants’ motion to dismiss. They explained that their claims "ha[d] nothing to do with whether Defendants would ever reduce the prices of their bottles of medication. The reason patients would save money is that they would not need to buy so many bottles” at the same price, because their bottles “would have lasted longer” and ultimately “their therapy would [have] cost them less.” D.N.J. Civ. Case No. 14-5859, Doc. No. 91, at 20-21. . The Dissent suggests that Plaintiffs have not established standing because their "alleged economic injury” is "overly speculative.” Diss. Op. at 174, It discusses in some detail Plaintiffs’ theory of economic injury, which our colleague regards as unreasonable. Our learned colleague also cites to Dominguez v. UAL Corp., 666 F.3d 1359 (D.C. Cir. 2012), for the proposition that too-speculative economic injuries cannot confer standing. Three years after Dominguez, the D.C. Circuit considered a case which a District Court had dismissed for lack of standing on the purported basis of “an attenuated, speculative chain of events that relies on numerous independent actors." Osborn v. Visa Inc., 797 F.3d 1057, 1063 (D.C. Cir. 2015). In reversing the District Court, the D.C. Circuit specifically - rejected the lower court "demanding proof of an economic theory that was not required in a complaint,” id.., and differentiated between cases decided at later stages (such as summary judgment) and dismissals on the basis of lack of standing. Id. at 1064. "A Rule 12(b)(1) motion ... is not the occasion for evaluating the empirical accuracy of an economic theory.” Id. at 1065-66. In its discussion of the merits of Plaintiffs’ theory of economic injury—partly by reference to out-of-record material, Diss. Op. at 174-75, fn. 24-25—the Dis-sent engages in just that type of evaluation. Whether Plaintiffs defeat motions to dismiss for failure to state a claim and for summary judgment, or can convince a jury, the facts alleged “pass muster for standing purposes at the pleadings stage.” Osborn, 797 F.3d at 1066. . Impossibility preemption, one of several types of preemption, applies "when it is ‘impossible for a private party to comply with both state and federal requirements.' ” In re Fosamax (Alendronate Sodium) Products Liability Litig., 852 F.3d 268, 282 (3d Cir. 2017) (quoting PLIVA, Inc. v. Mensing, 564 U.S. 604, 618, 131 S.Ct, 2567, 180 L.Ed.2d 580 (2011)).