**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 17-2678
_____

CHRISTOPHER MIELO; SARAH HEINZL,
individually and on behalf of all others similarly situated

v.

STEAK 'N SHAKE OPERATIONS, INC.,
                                        Appellant
_____

On Appeal from the United States District Court
for the Western District of Pennsylvania
(W.D. Pa. No. 2-15-cv-00180)
District Judge: Honorable Robert C. Mitchell

Argued May 2, 2018

Before: SMITH, *Chief Judge,* HARDIMAN, and
RESTREPO, *Circuit Judges*

(Filed: July 26, 2018)

Maria G. Danaher
Patrick J. Fazzini
Ogletree, Deakins, Nash, Smoak & Stewart
One PPG Place, Suite 1900
Pittsburgh, PA 15222

David H. Raizman                    [ARGUED]
Ogletree Deakins
400 South Hope Street
Suite 1200
Los Angeles, CA 90071
        *Counsel for Appellant*

Teresa L. Jakubowski
Barnes & Thornburg
1717 Pennsylvania Avenue, N.W.
Suite 500
Washington, DC 20006
        *Counsel for Amicus Appellants*

Cary Silverman
Shook Hardy & Bacon
1155 F. Street, N.W., Suite 200
Washington, DC 20004
        *Counsel for Amicus Appellants*

R. Bruce Carlson
Stephanie K. Goldin
Edwin J. Kilpela, Jr.                [ARGUED]

Benjamin J. Sweet
Carlson Lynch Sweet & Kilpela
1133 Penn Avenue
5th Floor Suite 210
Pittsburgh, PA 15222
        *Counsel for Appellee*

Sharon M. Krevor-Weisbaum
Brown Goldstein & Levy
120 East Baltimore Street
Suite 1700
Baltimore, MD 21202
        *Counsel for Amicus Appellee*

Amy F. Robertston
Civil Rights & Enforcement Center
104 Broadway
Suite 400
Denver, CO 80203
        *Counsel for Amicus Appellees*

————————————

OPINION

————————————

SMITH, *Chief Judge*.

3

## TABLE OF CONTENTS

INTRODUCTION ........................................................5

I. BACKGROUND ......................................................6

    A. *Factual Background* ........................................6

    B. *Procedural History* .......................................9

    C. *Applicable Law and Theory of Harm* ........................11

II. PLAINTIFFS HAVE STANDING .......................................19

    A. *Injury in Fact* ...........................................20

    B. *Traceability* .............................................26

    C. *Redressability* ...........................................27

III. PLAINTIFFS FAIL TO SATISFY RULE 23(A) .........................30

    A. *Numerosity* ...............................................34

    B. *Commonality* ..............................................44

    C. *The Need for Remand* ......................................53

CONCLUSION .........................................................54

## INTRODUCTION

In this class action lawsuit, two disability rights advocates have sued Steak 'n Shake under the Americans with Disabilities Act ("ADA"). Alleging they have personally experienced difficulty ambulating in their wheelchairs through two sloped parking facilities, these Plaintiffs seek to sue on behalf of all physically disabled individuals who may have experienced similar difficulties at Steak 'n Shake restaurants throughout the country. The District Court certified Plaintiffs' proposed class, and Steak 'n Shake now appeals that certification decision. We are tasked with answering two questions: First, whether Plaintiffs have standing under Article III of the United States Constitution, and second, whether they have satisfied the requirements set out in Federal Rule of Civil Procedure 23(a).

As to the first question, we conclude that Plaintiffs have standing to bring their claims in federal court. Although a mere procedural violation of the ADA does not qualify as an injury in fact under Article III, Plaintiffs allege to have personally experienced concrete injuries as a result of ADA violations on at least two occasions. Further, Plaintiffs have sufficiently alleged that these injuries were caused by unlawful corporate policies that can be redressed with injunctive relief. We withhold judgment as to whether those corporate policies are indeed unlawful, as our standing inquiry extends only so far as to

permit us to ensure that Plaintiffs have sufficiently pled as much.

As to the second question before us, we conclude that Plaintiffs have failed to satisfy Rule 23(a). The extraordinarily broad class certified by the District Court runs afoul of at least two of Rule 23(a)'s requirements. In light of this conclusion, the District Court's judgment will be reversed, and this matter will be remanded to the District Court to reconsider if a class should be certified.

## I. BACKGROUND

The District Court had jurisdiction pursuant to 28 U.S.C. § 1331 and 42 U.S.C. § 12188. This matter comes to us pursuant to Federal Rule of Civil Procedure 23(f), which permits a court of appeals to allow "an appeal from an order granting or denying class-action certification." FED. R. CIV. P. 23(f). We exercise appellate jurisdiction pursuant to 28 U.S.C. § 1292(e). We review a district court's class certification decision under an abuse of discretion standard. *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 312 (3d Cir. 2008). We review *de novo* the legal standards applied by a district court in reaching the certification decision. *Id.*

### A. *Factual Background*

Christopher Mielo and Sarah Heinzl ("Plaintiffs") are physically disabled individuals who claim they have

personally experienced difficulty in ambulating through steeply graded parking facilities at one Steak 'n Shake location each. Specifically, Mielo alleges that he "experienced unnecessary difficulty and risk due to excessive slopes in a purportedly accessible parking space and access aisle"[1] at a Steak 'n Shake in East Munhall, Pennsylvania. JA 90, 439. Heinzl alleges that she "experienced unnecessary difficulty and risk due to excessive surface slope in purportedly accessible parking spaces and access aisles, and excessive cross slope along the route connecting purportedly accessible parking spaces to the facility's entrance" at a Steak 'n Shake in Pleasant Hills, Pennsylvania. JA 90, 404–07. After experiencing these alleged violations, neither Mielo nor Heinzl notified anyone at Steak 'n Shake, although they did contact a lawyer. JA 408–10, 441–42; *see also* National Association of Convenience Stores, National Grocers Association, and Food Marketing Institute Amici Br. 8 (stating that "21 of the 135 [ADA] Title III lawsuits filed in federal court in Pennsylvania in 2014 were filed on behalf of one of the plaintiffs in this case, Christopher

---

[1] An "access aisle" is a designated area located adjacent to an accessible parking space. As Mielo helpfully explains in his deposition, an "access aisle is that dash line that people love to park in when they shouldn't . . . it's that area, you know, for ramps or for doors to open, things like that." JA 445.

Mielo"); Katherine Corbett, Julie Farrar-Kuhn, Carrie Ann Lucas, Julie Reiskin, and the Civil Rights Education and Enforcement Center Amici Br. 3 n.1, 18 (noting it is not uncommon for disability advocates to serve as repeat class representatives).

In addition to these two Pennsylvania locations, Plaintiffs allege specific ADA violations at six other Steak 'n Shake restaurants located throughout Pennsylvania and Ohio. JA 90–92. Although Mielo and Heinzl do not claim to have personally experienced violations at the six other locations,[2] the law firm representing them hired an investigator who visited these locations and recorded evidence purportedly supporting the existence of violations. JA 90. Relying on the investigator's discoveries at these six additional locations, as well as their own experiences at the East Munhall and Pleasant Hills locations, Mielo and Heinzl seek to enjoin Steak 'n Shake on a national basis by requiring the company to adopt corporate policies relating to ADA compliance. There are over 500 Steak 'n Shake restaurants located

---

[2] Mielo and Heinzl have visited other Steak 'n Shake locations in the past, but each alleges to have personally experienced ADA violations at only one restaurant location. JA 411, 446–51.

8

throughout the United States, approximately 417 of which are at issue in this appeal.[3]

## B. *Procedural History*

Plaintiffs' complaint requests both "a declaration that [Steak 'n Shake's] facilities violate federal law," and "an injunction requiring [Steak 'n Shake] to remove the identified access barriers so that [Steak 'n Shake's] facilities are fully accessible to, and independently usable by individuals with mobility disabilities, as required by the ADA." JA 87. Plaintiffs propose novel interpretations of the ADA and its corresponding regulations, according to which Steak 'n Shake would not only be required to correct access barriers, but would also be required to adopt corporate policies directing Steak 'n Shake employees to continually search for hypothetical access barriers that might need correcting. Despite the novelty of these

---

[3] Specifically, there are "approximately 562 Steak 'n Shake locations in 33 states." Appellant Br. 6. Of those locations, 144 are franchised restaurants. Because Steak 'n Shake does not build or maintain the parking facilities at franchised locations, that leaves approximately 417 at issue in this appeal involving a proposed class limited to restaurant locations where Steak 'n Shake "owns, controls and/or operates the parking facilities." JA 75; *see also* Appellee Br. 41 ("This case seeks to challenge the same policies and practices that are applied uniformly to approximately 417 restaurants.").

9

interpretations, Steak 'n Shake has not yet filed a motion to dismiss or motion for summary judgment.

On April 27, 2017, the District Court granted Plaintiffs' motion to certify a class under Federal Rule of Civil Procedure 23(b)(2). JA 75. The certified class was defined as follows:

> All persons with qualified mobility disabilities who were or will be denied the full and equal enjoyment of the goods, services, facilities, privileges, advantages or accommodations of any Steak 'n Shake restaurant location in the United States on the basis of a disability because such persons encountered accessibility barriers at any Steak 'n Shake restaurant where Defendant owns, controls and/or operates the parking facilities.

JA 75. As part of its certification ruling, the District Court appointed Mielo and Heinzl as class representatives. JA 75.

In certifying the class, the District Court analyzed the underlying law in this case. Although discussion of such underlying law must necessarily be limited when conducting the standing analysis here, *Cottrell v. Alcon Labs.*, 874 F.3d 154, 162 (3d Cir. 2017) (referring to the "fundamental separation between standing and merits at

10

the dismissal stage"), that law is intertwined with our Rule 23 inquiry. *Hydrogen Peroxide*, 552 F.3d at 307 ("[T]he court must resolve all factual or legal disputes relevant to class certification, even if they overlap with the merits— including disputes touching on elements of the cause of action."); *Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 591 (3d Cir. 2012) (stating that a "court cannot be bashful" when determining "whether there is actual conformance with Rule 23"). In light of this overlap, we briefly lay out the law upon which Plaintiffs rest their claims.

## C. *Applicable Law and Theory of Harm*

The ADA seeks to "provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C § 12101. Title III of that landmark civil rights law specifically prohibits discrimination against the disabled in the full and equal enjoyment of any place of public accommodation. *See* 42 U.S.C. § 12182(a). Title III applies to buildings built both before and after the ADA's enactment. Specifically, Title III requires "places of public accommodation"[4] to "remove architectural barriers … in existing facilities … where such removal is readily

---

[4] Steak 'n Shake restaurants qualify as places of public accommodation. 42 U.S.C. § 12181(7)(B) (referring to "a restaurant, bar, or other establishment serving food or drink").

11

achievable," 42 U.S.C. § 12182(b)(2)(A)(iv), and to "design and construct facilities for first occupancy [no] later than 30 months after July 26, 1990, that are readily accessible to and usable by individuals with disabilities, except where an entity can demonstrate that it is structurally impracticable to meet the requirements of such subsection." 42 U.S.C. § 12183(a)(1).

Plaintiffs seek injunctive relief to require Steak 'n Shake to adopt centralized corporate policies crafted to ensure that potential discriminatory access violations are actively sought out and corrected. Plaintiffs seek to do so pursuant to the ADA, which permits private individuals to seek injunctive relief. As 42 U.S.C. § 12188(a)(1)(2) provides:

> (1) Availability of remedies and procedures. The remedies and procedures set forth in section 2000a-3(a)[5] of this title are the

---

[5] Section 2000a-3(a) provides a private right of action. 42 U.S.C. § 2000a-3 ("Whenever any person has engaged or there are reasonable grounds to believe that any person is about to engage in any act or practice prohibited by section 2000a-2 of this title, a civil action for preventive relief, including an application for a permanent or temporary injunction, restraining order, or other order, may be instituted by the person aggrieved. . . ."). Section 2000a-2 prohibits any person from "withhold[ing], deny[ing], or attempt[ing] to withhold or deny, or deprive or attempt to

12

remedies and procedures this subchapter provides to any person who is being subjected to discrimination on the basis of disability . . . .

(2) Injunctive relief.

In the case of violations of sections 12182(b)(2)(A)(iv)[6] and section 12183(a)[7] of

─────────────

deprive any person of any right or privilege secured by section 2000a or 2000a-1 of this title." 42 U.S.C. § 2000a-2. Section 2000a provides, in part, that "[a]ll persons shall be entitled to the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of any place of public accommodation." 42 U.S.C. § 2000a(a). Section 2000a-1 provides, in part, that "[a]ll persons shall be entitled to be free, at any establishment or place, from discrimination." 42 U.S.C. § 2000a-1.

[6] Section 12182(b)(2)(A)(iv) defines discrimination to include "a failure to remove architectural barriers, and communication barriers that are structural in nature, in existing facilities . . . where such removal is readily achievable." 42 U.S.C. § 12182(b)(2)(A)(iv).

[7] Section 12183(a) defines discrimination to include both "a failure to design and construct facilities for first occupancy later than 30 months after July 26, 1990, that are readily accessible to and usable by individuals with

13

this title, injunctive relief shall include an order to alter facilities to make such facilities readily accessible to and usable by individuals with disabilities to the extent required by this subchapter. Where appropriate, injunctive relief shall also include requiring the provision of an auxiliary aid or service, modification of a policy, or provision of alternative methods, to the extent required by this subchapter.

42 U.S.C. § 12188(a)(1)(2). Of the many interconnected sections mentioned within the statutory language laid out above, 42 U.S.C. § 12182(b)(2)(A)(iv) is perhaps the most relevant to our Rule 23(a) analysis.[8] We must, therefore, look at it closely.

---

disabilities, except where an entity can demonstrate that it is structurally impracticable," 42 U.S.C. § 12183(a)(1), as well as older buildings that are altered after July 26, 1990. 42 U.S.C. § 12183(a)(2).

[8] Section 12182(b)(2)(A)(iv) is particularly important to our Rule 23(a)(2) inquiry. Section 12182(b)(2)(A)(iv) refers to the term "architectural barriers," which, as outlined in the ADA's corresponding regulations, is a broad term that covers a large swath of restaurant features from parking spaces to bathroom mirrors. *See* 28 C.F.R. § 36.304(b) (listing "[e]xamples of steps to remove

Section 12182(b)(2)(A)(iv) states that, for purposes of 42 U.S.C. § 12182(a),[9] the term "discrimination" shall include a "failure to remove architectural barriers . . . where such removal is readily achievable." 42 U.S.C. § 12182. While the ADA itself fails to define "architectural barriers," the Department of Justice's ADA Guide for Small Businesses defines "architectural barriers" as:

> [P]hysical features that limit or prevent people with disabilities from obtaining the goods or services that are offered. They can include parking spaces that are too narrow to accommodate people who use wheelchairs; a step or steps at the entrance or to part of the selling space of a store; round doorknobs or door hardware that is difficult to grasp; aisles that are too narrow for a person using a wheelchair, electric scooter, or a walker; a

barriers"). As Part III.B. will explain, this presents a Rule 23(a)(2) commonality issue since class members may have been injured by different types of architectural barriers.

[9] 42 U.S.C. § 12182(a) ("General rule. No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation.").

> high counter or narrow checkout aisles at a cash register, and fixed tables in eating areas that are too low to accommodate a person using a wheelchair or that have fixed seats that prevent a person using a wheelchair from pulling under the table.

ADA Guide for Small Businesses, at 3, available at https://www.ada.gov/smbusgd.pdf. The Department of Justice promulgated guidelines pursuant to 42 U.S.C. § 12186 (providing that "the Attorney General shall issue regulations").

One regulation, 28 C.F.R. § 36.211 ("Section 211"), is of central importance to Plaintiffs' theory of harm. That regulation arguably refers to a restaurant's "ongoing" maintenance obligation, providing:

> Maintenance of accessible features.
> (a) A public accommodation shall maintain in operable working condition those features of facilities and equipment that are required to be readily accessible to and usable by persons with disabilities by the Act or this part.
> (b) This section does not prohibit isolated or temporary interruptions in service or access due to maintenance or repairs. . . .

28 C.F.R. § 36.211. As the District Court interpreted Section 211:

16

> Title III's implementing regulations . . . require places of public accommodation to maintain in operable working condition those features of facilities and equipment that are required to be readily accessible to and usable by persons with disabilities. 28 C.F.R. § 36.211(a). This ongoing obligation broadly covers all features that are required to be accessible under the ADA.

JA 62 (internal quotation marks omitted). Although we must refrain from engaging in a freewheeling merits analysis while undertaking our inquiries into standing and Rule 23's requirements, we nevertheless note the weight that Section 211 must bear in order to support Plaintiffs' case in chief. To summarize Plaintiffs' theory of harm, the ADA and its corresponding regulations not only require Steak 'n Shake to correct discriminatory access violations, but also to adopt policies for ADA compliance that require Steak 'n Shake to actively *seek out* potential violations.[10]

---

[10] Referring to the "gravamen" of their lawsuit, Plaintiffs contend that "liability is premised on the fact that [Steak 'n Shake's] current policies and practices directly result in unidentified access violations that are addressed only when individuals with disabilities complain . . . ." Appellee Br. 22. As Plaintiffs elaborate, "[a]fter construction, [Steak 'n Shake] does not conduct ADA-specific assessments at any of its restaurants to ensure that

the restaurants remain ADA compliant." Appellee Br. 6. Further, Plaintiffs complain that Steak 'n Shake's "established maintenance procedures similarly ignore the ADA," and that the company's "maintenance employees do not receive any training with regard to ADA compliance issues, thus making it unlikely that ADA-related issues would be identified on an ad hoc basis." Appellee Br. 7.

Plaintiffs implicitly argue that it would be good policy to interpret Section 211 to require places of public accommodation to actively *seek out* access violations, as compared to correcting access violations as they are discovered. *See* Appellee Br. 37 (arguing that Steak 'n Shake "effectively . . . push[es] its obligation to maintain the accessibility of its restaurants onto customers"). But while relieving customers of the burden of bringing access violations to the attention of restaurants might be good policy, it appears to be in tension with the very policy which Congress codified in the text of the ADA.

In enacting the ADA, Congress made clear that "the nature and cost" of a particular action, as well as "the overall financial resources of the facility or facilities involved in the action," must be taken into account when determining whether a particular access violation constitutes ADA "discrimination" that must be corrected. 42 U.S.C. § 12181(9). In doing so, Congress heeded the obvious: places of public accommodation have finite resources to allocate to correcting access violations.

In light of our inability to fully engage the merits at this stage of the litigation, we are not at liberty to decide whether Plaintiffs' novel interpretation of the ADA and its corresponding regulations would survive a dispositive motion under either Rule 12(b)(6), or Rule 56 of the Federal Rules of Civil Procedure.

## II. PLAINTIFFS HAVE STANDING

To establish Article III standing, a plaintiff must have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). As "[t]he party invoking federal jurisdiction," a plaintiff "bears the burden of establishing these elements." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1997); *see also Finkelman v. Nat'l Football League*, 810 F.3d 187, 194 (3d Cir. 2016).

---

The text of the ADA seems to suggest, then, that disabled patrons like Mielo and Heinzl are better served when restaurants are required to spend their limited financial resources on correcting only the access violations that disabled patrons have actually brought to the restaurant's attention—rather than requiring those establishments to expend their limited resources in an ongoing search for potential violations that may not exist.

19

In the class action context, our standing inquiry focuses solely on the class representative(s). As we squarely held in *Neale v. Volvo Cars of N. Am., LLC*, "putative class members need not establish Article III standing. Instead, the 'cases or controversies' requirement is satisfied so long as a class representative has standing, whether in the context of a settlement or litigation class." *Neale v. Volvo Cars of N. Am., LLC*, 794 F.3d 353, 362 (3d Cir. 2015). Given that restriction, we turn to the allegations put forward by Mielo and Heinzl and determine whether, as class representatives, they satisfy all three elements of standing.

## A. *Injury in Fact*

The primary element of standing is injury in fact, and it is actually a conglomerate of three components. *See Spokeo, Inc.*, 136 S. Ct. at 1547. To establish an injury in fact, a plaintiff must first "show that he or she suffered 'an invasion of a legally protected interest.'" *Id*. at 1548 (quoting *Lujan*, 504 U.S. at 560). Second, a plaintiff must show that the injury is both "concrete and particularized." *Id.* Third, a plaintiff must also show that his or her injury is "actual or imminent, not conjectural or hypothetical." *Id.*

In determining whether Plaintiffs have suffered an invasion of a legally protected interest, we must carefully "separate our standing inquiry from any assessment of the merits of the plaintiff's claim." *Cottrell*, 874 F.3d at 162.

20

Unlike a Rule 23 inquiry, where courts are often required to make factual and legal determinations pertaining to a plaintiff's underlying cause of action, our standing inquiry must avoid any consideration of the merits beyond a screening for mere frivolity. *Initiative & Referendum Inst. v. Walker*, 450 F.3d 1082, 1093 (10th Cir. 2006) (en banc) ("[A] plaintiff whose claimed legal right is so preposterous as to be legally frivolous may lack standing on the ground that the right is not 'legally protected.'"). Here, although Plaintiffs' theory may not ultimately prove successful on the merits, Plaintiffs present a colorable argument that the ADA requires Steak 'n Shake to adopt new policies requiring them to actively seek out and correct access violations. Given the constraints on our ability to subject Plaintiffs' claims to additional scrutiny at this point, we are satisfied that they have alleged a non-frivolous claim that they suffered an invasion of a legally protected interest.[11]

---

[11] In *Cottrell*, we pondered whether the phrase "legally protected interest" constituted a third component of the injury in fact inquiry, or was instead "simply a reformulation of the other components of injury in fact." *Cottrell v. Alcon Labs.*, 874 F.3d 154, 164 (3d Cir. 2017). We noted, for example, that the phrase had "not appeared with regularity in Supreme Court opinions addressing standing." *Id.* at 163. But since *Cottrell*, the Supreme Court decided *Gill v. Whitford*, 138 S. Ct. 1916 (2018),

The second component of injury in fact requires that an alleged injury be both "concrete" and "particularized." To the extent that Plaintiffs allege only a harm in the mere existence or absence of particular corporate policies, Plaintiffs lack standing. As we recognized in *Cottrell*, "[b]are procedural or technical violations of a statute alone will not satisfy the concreteness requirement." *Cottrell*, 874 F.3d at 167 (citing *Spokeo*, 136 S. Ct. at 1549).[12] Therefore, even assuming that Steak 'n Shake violated the ADA by failing to have an adequate ADA compliance policy in place, the mere nonexistence of such a policy would not afford Plaintiffs a basis to establish standing. In other words, Plaintiffs would still need to show how the lack of a policy resulted in a concrete harm that was particular to them. Because Plaintiffs do not allege how

which provides further guidance for courts undertaking a standing analysis. In *Gill*, the Supreme Court again referred to the "invasion of a legally protected interest" as a distinct component of the injury in fact inquiry. *Gill*, 138 S. Ct. at 1929. In light of *Gill*, we clarify that the phrase "invasion of a legally protected interest" does constitute a distinct component of the injury in fact inquiry. A plaintiff must sufficiently allege to have suffered such an invasion in order to establish Article III standing.

[12] This is not to say, however, that *Spokeo* foreclosed standing for all procedural violations—it did so only for those that are "bare." *Spokeo*, 136 S. Ct. at 1549 (2016).

22

the mere nonexistence of a particular corporate policy constitutes a concrete harm in and of itself,[13] they cannot rely on the want of such a policy as a basis for standing.

But although Plaintiffs' complaint could be read as alleging no more than mere procedural violations of the ADA, our caselaw requires us to "examine the allegations in the complaint from a number of different angles to see if [plaintiffs'] purported injury can be framed in a way that satisfies Article III." *Finkelman*, 810 F.3d at 197. Further examining Plaintiffs' complaint in light of this obligation, we conclude that they have sufficiently alleged a concrete harm in the form of experiencing actual physical difficulty in ambulating through parking facilities which are allegedly not ADA-compliant.[14] Moreover, because

---

[13] This is not to say that the nonexistence (or existence) of a corporate policy can never be a liability-triggering act that *causes* a concrete harm. As we explain in Part II.B., although an allegedly unlawful policy is not *itself* a concrete harm, it can qualify, at least at the pleading stage, as the *cause* of concrete harms that Plaintiffs claim they have experienced when attempting to ambulate through parking facilities which violate the ADA.

[14] Although we conclude that these alleged physical harms qualify as "concrete," we point out that "'concrete' is not . . . necessarily synonymous with 'tangible.'" *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1549 (2016).

23

Plaintiffs allege they *personally* experienced these concrete injuries, we further conclude that they have sufficiently alleged an injury that is particular to them. *Spokeo*, 136 S. Ct. at 1548 ("We have made it clear time and time again that an injury in fact must be *both* concrete *and* particularized.") (emphases added).

Of course, Plaintiffs seek to require Steak 'n Shake to correct alleged ADA violations at more than the two restaurant locations where they claim to have actually experienced injury. Highlighting Plaintiffs' geographically expansive request, Steak 'n Shake argues that Plaintiffs do not have standing to seek relief beyond the East Munhall and Pleasant Hills locations. Appellant Br. 57–59. In taking this tack, however, Steak 'n Shake conflates Article III standing with requirements of Rule 23.

As we made clear in *Neale*, "a properly formulated Rule 23 class should not raise standing issues." *Neale*, 794 F.3d at 368. Rather than "shoehorn . . . questions into an Article III analysis," the standing inquiry must be limited to a consideration of the class representatives themselves, after which we may "employ Rule 23 to ensure that classes are properly certified." *Id*. With *Neale* in mind, we reject Steak 'n Shake's invitation to insert Rule 23 issues into our inquiry on standing.

Finally, the third component of the injury in fact inquiry requires Plaintiffs to show that their injury is actual

24

or imminent, rather than conjectural or hypothetical. After conceptualizing Plaintiffs' alleged injury as experiencing physical difficulty in the form of ambulating through allegedly unlawful parking facilities, it is clear that this third subcomponent is easily satisfied. The physical injuries of which Plaintiffs complain are not merely hypothetical or conjectural, they have actually occurred.[15]

---

[15] Steak 'n Shake contends that Plaintiffs do not have standing to seek injunctive relief at either the East Munhall or Pleasant Hills locations. Appellant Br. 55–57. As Steak 'n Shake argues, "there is no evidence establishing any likelihood that Plaintiffs will return to those two respective locations." Appellant Br. 55. Steak 'n Shake's argument is unpersuasive. Although Steak 'n Shake makes much of the unsurprising fact that Plaintiffs do not purport to know the exact date of their next visit to a Steak 'n Shake restaurant, this argument misses the point. Plaintiffs contend they are *currently* "deterred from returning to [Steak 'n Shake] facilities." JA 93 (Complaint). This allegation is supported by record evidence illustrating that Plaintiffs have visited many Steak 'n Shake restaurant locations in the past, and that Plaintiffs enjoy the food offered at those restaurants. *See, e.g.*, JA 737–40, 751–54. In this sense, the injury providing Plaintiffs with standing to seek injunctive relief is not merely hypothetical or even imminent—it is *actual*, in that this allegedly unlawful deterrence is something that Plaintiffs are currently suffering. *See also* 42 U.S.C. § 12188(a)(1) ("Nothing in this section shall require a

We conclude, therefore, that Plaintiffs have sufficiently alleged that they suffered an injury in fact.

## B. *Traceability*

The second element of standing requires Plaintiffs to establish that their alleged injury in fact "is fairly traceable to the challenged conduct of the defendant." *Spokeo*, 136 S. Ct. at 1547. As we have previously explained, this element is not satisfied if the alleged injury is merely "the result of the independent action of some third party not before the court." *Finkelman*, 810 F.3d at 193. Moreover:

> This requirement is akin to "but for" causation in tort and may be satisfied even where the conduct in question might not have been a proximate cause of the harm. An indirect causal relationship will suffice, provided that there is a fairly traceable connection between the alleged injury in fact and the alleged conduct of the defendant.

*Id.* at 193–94 (internal citations omitted). Plaintiffs allege that their injuries were "caused" by Steak 'n Shake's

person with a disability to engage in a futile gesture if such person has actual notice that a person or organization covered by this subchapter does not intend to comply with its provisions.").

26

unlawful corporate policies. In other words, Plaintiffs allege that "but for" Steak 'n Shake's policies there would be no injury. While Plaintiffs will face a heavier burden to establish causation should they eventually be put to their proof, their burden of establishing causation at the pleadings stage is less stringent. *Lujan*, 504 U.S. at 561 ("[E]ach element [of standing] must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation."). Accordingly, we conclude that Plaintiffs have satisfied the traceability element of standing.

## C. *Redressability*

The third standing element requires Plaintiffs to show that their injury "is likely to be redressed by a favorable judicial decision." *Spokeo*, 136 S. Ct. at 1547. "This requires the plaintiff to show that it is 'likely, as opposed to merely speculative,' that the alleged injury will be redressed by a favorable decision." *Finkelman*, 810 F.3d at 194 (quoting *Lujan*, 504 U.S. at 561). Although this third element of standing presents a close call, we conclude that Plaintiffs have satisfied it.

Courts must be cognizant of "the rule that a 'remedy must of course be limited to the inadequacy that produced the injury in fact that the plaintiff has established.'" *Gill v. Whitford*, 138 S. Ct. 1916, 1931 (2018) (quoting *Lewis v. Casey*, 518 U.S. 343, 357 (1996)). Bearing in mind that

Plaintiffs do not have standing to seek remedies corresponding to mere procedural violations of the ADA, we consider whether the declaratory and injunctive relief Plaintiffs seek will likely satisfy the only injuries they have successfully alleged: physical injuries associated with ambulating through steeply graded parking facilities, and the deterrent effect that these injuries have on Plaintiffs' ability to enjoy Steak 'n Shake's services in the future.

Plaintiffs provide three examples of injunctions, any one of which they contend would remedy their injuries. First, Plaintiffs propose that the District Court could develop "training protocols" intended to "ensure" that Steak 'n Shake's maintenance employees "are aware of the ADA's structural requirements and know how to identify access violations for prompt repair." Appellee Br. 50. Second, Plaintiffs propose that the District Court direct Steak 'n Shake "to conduct annual ADA-specific inspections to ensure accessibility has been maintained." *Id.* Third, Plaintiffs propose that the District Court direct Steak 'n Shake "to refrain from engaging in its current practice" of performing ADA inspections only in response to complaints brought to the company's attention by patrons. *Id.*

Each of the proposed injunctions suffer from the same flaw: Not one specifically directs that an allegedly non-compliant parking facility slope be corrected. And if

an ADA-violative slope has not been remedied, the plaintiffs' resultant injuries will persist. In order for any injuries to be remedied, Steak 'n Shake would need not only to adopt one of Plaintiffs' proposed policies but also to *take the additional step* of actually implementing that policy. Obviously, mere adoption of a policy, without more, would not guarantee the correction of discriminatory barriers. Steak 'n Shake could be in compliance with a court order requiring them *to adopt* a new policy and still fail to correct access violations. In that case, failure to take the additional step of abiding by a newly-adopted corporate policy would not constitute a violation of the District Court's injunction. It would merely be a violation of the policy *itself*.

Yet even with this daylight between Plaintiffs' proposed injunctions and the actual remedying of injuries, we recognize that a plaintiff need only establish that a favorable judicial decision be "likely" to remedy a plaintiff's injury in fact. *Lujan*, 504 U.S. at 561. Nothing before us suggests that individual Steak 'n Shake locations would prove unable or unwilling to adhere to a new corporate policy requiring the company to actively seek out access violations. Moreover, Plaintiffs' complaint includes a request that the District Court "retain jurisdiction over this matter for a period to be determined," in part "to ensure that [Steak 'n Shake] comes into compliance with the relevant requirements of the ADA." JA 87. Such a retention of jurisdiction would permit the

29

District Court to address any potential failures by Steak 'n Shake to actually correct discriminatory barriers that were discovered as a result of new policies. We conclude, therefore, that the adoption of a policy similar to the three examples offered by Plaintiffs would likely remedy Plaintiffs' alleged injuries. Plaintiffs' have satisfied all three elements of standing.

## III. PLAINTIFFS FAIL TO SATISFY RULE 23(A)

As former-Judge Posner has described it, "[t]he class action is an ingenious procedural innovation that enables persons who have suffered a wrongful injury, but are too numerous for joinder of their claims alleging the same wrong committed by the same defendant or defendants to be feasible, to obtain relief as a group . . . ." *Eubank v. Pella Corp.*, 753 F.3d 718, 719 (7th Cir. 2014). Given that class actions are "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only," *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 700–701 (1979)), a plaintiff wishing to bring a lawsuit in federal court must first satisfy the explicit requirements set forth in Rule 23(a). This calls for a rigorous analysis that usually requires courts to make factual findings and legal conclusions that overlap the underlying merits of the suit. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350–51 (2011). Second, if the requirements of Rule 23(a) have been satisfied, the party

seeking certification must also establish that her claim fits within one of the three types of class categories outlined in Rule 23(b). *Hydrogen Peroxide*, 552 F.3d at 309 n.6 (citing *General Telephone Co. of Southwest v. Falcon*, 457 U.S. 147, 155 (1982)).

Here, Plaintiffs have sought to establish a Rule 23(b)(2)[16] class for which injunctive relief is appropriate to the class as a whole. JA 93. But in defining the certified class, the District Court's Rule 23 analysis was flawed

---

[16] Rule 23(b)(2) requires establishing that "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." FED R. CIV. P. 23(b)(2). Subdivision (b)(2) often involves "actions in the civil-rights field where a party is charged with discriminating unlawfully against a class." FED. R. CIV. P. 23 advisory committee notes. *See also* Karen Sandrik, Note, *Overlooked Tool: Promissory Fraud in the Class Action Context*, 35 FLA. ST. U. L. REV. 193, 204 n.79 (2007) (recognizing that "[t]he prototype of [a Rule 23(b)(2)] action is a civil rights case"). Although the requirements of Rule 23 must always be satisfied regardless of the type of class seeking certification, this civil rights action under the ADA is indeed the type of action for which Rule 23(b)(2) was originally designed.

31

from the start. Citing *Eisenberg v. Gagnon*, 766 F.2d 770, 785 (3d Cir. 1985), the District Court wrote that "when doubt exists concerning certification of the class, the court should err in favor of allowing the case to proceed as a class action." JA 39. This was clear error.

As we have previously explained, the "relaxed" class certification standard suggested in *Eisenberg* did not survive the 2003 amendments to Rule 23.[17] In *Hydrogen Peroxide*, we made clear that although the 2003 amendments were "subtle," they "reflect[ed] the need for

---

[17] For a brief description of some of the takeaways from the 2003 amendments, see Charles R. Korsmo, *Mismatch: The Misuse of Market Efficiency in Market Manipulation Class Actions*, 52 WM. & MARY L. REV. 1111, 1134 n.97 (2011) ("The 2003 amendments to Rule 23 . . . eliminated the provision from prior Rule 23(c)(1)(C) allowing 'conditional' certification of classes. . . . [And] Rule 23(c)(1)(A) was altered, replacing the requirement to certify a class 'as soon as practicable' with an instruction to certify 'at an early practicable time.' The advisory committee's notes state that '[a] court that is not satisfied that the requirements of Rule 23 have been met should refuse certification until they have been met,' and instruct courts that 'it is appropriate to conduct controlled discovery into the 'merits,' limited to those aspects relevant to making the certification decision on an informed basis.'" (internal citations omitted)).

a thorough evaluation of the Rule 23 factors." *Hydrogen Peroxide*, 552 F.3d at 318. The *Hydrogen Peroxide* opinion, a landmark in Third Circuit class action jurisprudence, went on to explain that:

> Although the trial court has discretion to grant or deny class certification, the court should not suppress 'doubt' as to whether a Rule 23 requirement is met—no matter the area of substantive law. Accordingly, *Eisenberg* should not be understood to encourage certification in the face of doubt as to whether a Rule 23 requirement has been met… *Eisenberg* predates the recent amendments to Rule 23 which, as noted, reject tentative decisions on certification and encourage development of a record sufficient for informed analysis.

*Id.* at 321. Following *Hydrogen Peroxide*, we again dismissed *Eisenberg*'s outdated view in *In re Schering Plough Corp. ERISA Litig.*:

> Additionally, the Report and Recommendation invokes *Eisenberg v. Gagnon* for the proposition that "[u]ltimately, doubts are resolved in favor of class certification." Our decision in *Hydrogen Peroxide* makes clear that

33

> *Eisenberg* should not be read in this manner. . . .

*In re Schering Plough Corp. ERISA Litig.*, 589 F.3d 585, 600 n.14 (3d Cir. 2009) (internal citations omitted).

We repeat (hopefully for the last time): the "relaxed" Rule 23 standard suggested in *Eisenberg* is no longer the law of this circuit. When courts harbor doubt as to whether a plaintiff has carried her burden under Rule 23, the class should not be certified. *Hydrogen Peroxide*, 552 F.3d at 321. Rule 23 "does not set forth a mere pleading standard." *Dukes*, 564 U.S. at 350. Instead, it calls for a rigorous analysis in which "[f]actual determinations supporting Rule 23 findings must be made by a preponderance of the evidence," *Hydrogen Peroxide*, 552 F.3d at 307. With that in mind, we consider whether Plaintiffs have satisfied Rule 23(a)'s requirements.

## A. *Numerosity*

Rule 23(a)(1) requires that the proposed class be "so numerous that joinder of all members is impracticable." FED. R. CIV. P. 23(a)(1). Like other factual determinations underlying Rule 23 determinations, it is a "plaintiff's burden to demonstrate numerosity by a preponderance of the evidence." *Hayes v. Wal-Mart Stores, Inc.*, 725 F.3d 349, 358 (3d Cir. 2013).

34

In recent years the numerosity requirement has been given "real teeth." Robert H. Klonoff, *The Decline of Class Actions*, 90 WASH. U. L. REV. 729, 768 (2013). Although this strengthening of the numerosity inquiry has sometimes been criticized,[18] our precedent nonetheless demands that a court "make a factual determination, based on the preponderance of the evidence, that Rule 23's

---

[18] *See, e.g.*, Scott Dodson, *An Opt-in Option for Class Actions*, 115 MICH. L. REV. 171, 191–92 (2016) ("In the past, numerosity has not generally been a difficult criterion to satisfy. . . . But in today's age of stringent attention to the certification requirements, including the Supreme Court's admonition that the class must offer 'significant proof' of compliance, a number of courts have required proof of numerosity beyond what common sense might otherwise suggest." (quoting *Dukes*, 564 U.S. at 353) (footnotes omitted)); Robert H. Klonoff, *The Decline of Class Actions*, 90 WASH. U. L. REV. 729, 773 (2013) ("The strict approach [to numerosity] adopted by some courts represents yet another troublesome trend."). Some of this scholarship can be read as criticism of *Dukes* itself. *See also Dukes*, 564 U.S. at 350 (noting that "Rule 23 does not set forth a mere pleading standard," but instead requires a "party seeking class certification . . . [to] affirmatively demonstrate his compliance with the Rule—that is . . . be prepared to prove that there are in fact sufficiently numerous parties").

requirements have been met." *Marcus*, 687 F.3d at 596. To make such a determination, a court must be presented with evidence that would enable the court to do so without resorting to mere speculation. *Id.* at 597 (referring to "the line separating inference and speculation").

In *Marcus*, we considered the claims of a plaintiff who had leased a BMW automobile with four Bridgestone "run-flat tires"[19] and had alleged that those tires were defective. *Id.* at 588. The district court in that case certified a "class action brought on behalf of all purchasers and lessees of certain model-year BMWs equipped with Bridgestone [run-flat tires] sold or leased in New Jersey with tires that have gone flat and been replaced." *Id.* (internal quotations omitted). We vacated the district court's certification order, in part because the plaintiff had failed to satisfy his numerosity burden. *Id.* In outlining the requirements of a successful numerosity showing, we explained that:

> Of course, Rule 23(a)(1) does not require a plaintiff to offer direct evidence of the exact number and identities of the class members.

---

[19] "As their name suggests, [run-flat tires] can 'run' while 'flat.' Even if [a run-flat tire] suffers a total and abrupt loss of air pressure from a puncture or other road damage, the vehicle it is on remains stable and can continue driving for 50 to 150 miles at a speed of up to 50 miles per hour." *Marcus*, 687 F.3d at 588.

But in the absence of direct evidence, a plaintiff must show sufficient circumstantial evidence specific to the products, problems, parties, and geographic areas actually covered by the class definition to allow a district court to make a factual finding. Only then may the court rely on "common sense" to forgo precise calculations and exact numbers.

*Id.* at 596. One of the shortcomings of the district court's numerosity analysis in *Marcus* was that although there was evidence of BMW purchases on a nationwide scale, there was no evidence indicating the portion of those purchases that might have occurred in New Jersey—the geographic limitation of the relevant class.

While we noted that it was "tempting to assume that the New Jersey class meets the numerosity requirement based on the defendant companies' nationwide presence," we rejected the idea that giving in to such temptation could excuse speculation. *Id.* at 597. Because the plaintiff had presented a "complete lack of evidence specific to BMWs purchased or leased in New Jersey with Bridgestone RFTs that have gone flat and been replaced," we concluded that the district court's "numerosity ruling crossed the line separating inference and speculation." *Id.*

Applying the reasoning of *Marcus* a year later in *Hayes*, we considered a plaintiff's allegations that a

37

retailer violated a state consumer fraud statute by selling unredeemable service plans for products that were in reality sold "as-is." *Hayes*, 725 F.3d at 352. In *Hayes*, the plaintiff presented evidence of over 3,500 transactions that included both the sale of a service plan and a price override. *Id.* at 353. Because a price override was something that a store cashier did when selling an "as-is" product, the district court had reasoned that numerosity was satisfied since, "if even 5% of those [3,500] price overrides were for as-is items ineligible for Service Plan protection, the class would be sufficiently numerous under FED. R. CIV. P. 23(a)(1)." *Hayes*, 725 F.3d at 356. We disagreed.

Although the district court in *Hayes* was correct in pointing out that a cashier would perform a price override when selling an "as-is" product, those cashiers also performed price overrides in other scenarios—such as when a customer "requests a discount because the item is sold for less elsewhere," or when a customer "purchases an item and later finds it on sale." *Id.* at 352. Transactions falling within these other scenarios were not part of the class definition, which was comprised of only customers who purchased a "Service Plan to cover as-is products." *Id.* at 353.[20] As we explained in *Hayes*:

---

[20] Another problem with the *Hayes* plaintiff's attempt to rely on the 3,500 transactions calculation was that it did not account for how many of those transactions included

38

> [P]laintiff did not fulfill his burden of supplying circumstantial evidence specific to the products and problems involved [in] the litigation and instead premised his argument for numerosity on improper speculation. The only concrete numerical evidence presented to the court was that New Jersey Sam's Clubs had on record 3,500 transactions that included both a price-override and the sale of a Service Plan. But there is no factual basis for determining how many of these 3,500 transactions included the purchase of a Service Plan for an as-is item . . . . In short, the only conclusion that can be drawn from the evidence presented to the trial court is that the number of class members would be equal-to-or-less-than 3,500 and equal-to-or-greater-than zero. Within that range, we can only speculate as to the number of class members.

*Id.* at 357–58.

Plaintiffs attempt to carry their numerosity burden by offering three strands of evidence—but that evidence ultimately falls short. First, Plaintiffs point to census data

---

the sale of "as-is" products where the retailer ultimately honored the service plan—a factual characteristic that would have taken those transactions out of the class definition.

39

showing that "there are between 14.9 million to 20.9 million persons with mobility disabilities who live in the United States." Appellee Br. 41. Second, Plaintiffs point to a single off-hand comment made by a Steak 'n Shake executive speculating that it would be "fair" to say that "thousands of people with disabilities utilize [Steak 'n Shake] parking lots . . . each year." *Id.* at 41–42 (citing JA 155–56). Third, Plaintiffs ask this Court to use its "common sense" and conclude that numerosity has been satisfied. *See id.*

In assessing the sufficiency of these three strands of evidence, we begin by noting that although "[n]o minimum number of plaintiffs is required to maintain a suit as a class action," a plaintiff in this circuit can generally satisfy Rule 23(a)(1)'s numerosity requirement by establishing "that the potential number of plaintiffs exceeds 40." *Stewart v. Abraham*, 275 F.3d 220, 226–27 (3d Cir. 2001). In this light, Plaintiffs' first strand of evidence—indicating that there are between 14.9 million to 20.9 million persons with mobility disabilities who live in the United States—suggests that it is highly likely that at least 40 of those individuals would have experienced access violations at one of the Steak 'n Shake locations at issue in this litigation. But although those odds might be enough for a good wager, we must be mindful that "[m]ere speculation as to the number of class members—even if such speculation is 'a bet worth making'—cannot support

40

a finding of numerosity." *Hayes*, 725 F.3d at 357 (quoting *Marcus*, 687 F.3d at 596).

Plaintiffs point to a large number of disabled persons living in the United States. Yet they have presented no evidence that would permit us to use "common sense" to determine—rather than speculate about—the portion of those disabled individuals who have actually patronized a relevant Steak 'n Shake restaurant, let alone the portion who have experienced or will experience an ADA violation at one of those restaurants. As we explained in *Hayes*, "where a putative class is some subset of a larger pool, the trial court may not infer numerosity from the number in the larger pool alone." *Id.* at 358; *see also Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1267–68 (11th Cir. 2009) ("[T]he district court's inference of numerosity for a Florida-only class without the aid of a shred of Florida-only evidence was an exercise in sheer speculation. Accordingly, the district court abused its discretion by finding the numerosity requirement to be satisfied with respect to a Florida-only class.").

Plaintiffs' second strand of evidence advances their Rule 23(a)(1) burden no further. The single statement of a Steak 'n Shake executive characterizing the number of patrons who use company parking lots does not assuage our concerns about speculation. The fact that one of defendant's executives has *himself speculated* as to the number of disabled individuals who patronize a Steak 'n

Shake restaurant and traverse their parking lots adds nothing. Speculation "squared" is still speculation.

Perhaps sensing the weakness of their numerosity showing, Plaintiffs would have this court adopt the reasoning of the District Court that Rule 23(a)(1)'s numerosity requirement can be "relaxed in cases where injunctive and declaratory relief is sought." JA 42; Appellee Br. 45–46 (arguing that a request for injunctive relief is something that necessarily "factor[s] positively into the numerosity analysis"). Attempting to support relaxation of the numerosity requirement, Plaintiffs cite to *In re Modafinil Antitrust Litig.*, 837 F.3d 238 (3d Cir. 2016). To the extent that Plaintiffs seek to read *Modafinil* as suggesting that requests for injunctive relief relax Rule 23(a)'s standards in favor of the party seeking class certification, Plaintiffs stretch *Modafinil* too far. We take this opportunity, then, to clarify the import of that decision.

In *Modafinil*, we noted that:

We have not had occasion to list relevant factors that are appropriate for district court judges to consider when determining whether joinder would be impracticable. We do so now. This non-exhaustive list includes: judicial economy, the claimants' ability and motivation to litigate as joined plaintiffs, the financial resources of class members, the

> geographic dispersion of class members, the ability to identify future claimants, and whether the claims are for injunctive relief or for damages.

*In re Modafinil Antitrust Litig.*, 837 F.3d at 252–53. We start by simply highlighting that the injunction versus damages question referred to in *Modafinil* represents but a single factor within a *non-exhaustive* list of six. But even more fundamentally, *Modafinil* does not state—nor should it be read to suggest—that a plaintiff seeking injunctive relief will have an *easier* time satisfying Rule 23(a)(1) than plaintiffs seeking monetary damages. Whether a plaintiff seeks injunctive or monetary relief, her Rule 23(a)(1) burden remains the same. *Modafinil* simply seeks to elucidate the meaning of the word "impracticable" and suggests that when a court is determining whether a plaintiff has satisfied her burden of establishing whether joinder would be impracticable, the type of relief sought by a plaintiff may be one factor that a court takes into consideration. It will always be up to the district court to explain how the form of relief has impacted its analysis.

In sum, because Plaintiffs have failed to present evidence sufficient to permit us to go beyond speculation as to the impracticability of joinder, we conclude that Plaintiffs have failed to satisfy their Rule 23(a)(1) burden. If Plaintiffs wish to attempt to satisfy their Rule 23(a)(1) burden upon remand, they will need to provide evidence

that will permit the District Court to conclude that a sufficiently numerous group of disabled individuals have experienced or will experience ADA violations at a relevant Steak 'n Shake restaurant, and that joinder is thereby impracticable.

## B. *Commonality*

Rule 23(a)(2) requires Plaintiffs to demonstrate that "there are questions of law or fact common to the class." FED. R. CIV. P. 23(a)(2). As the Supreme Court recognized in *Dukes*, that "language is easy to misread, since '[a]ny competently crafted class complaint literally raises common questions.'" *Dukes*, 564 U.S at 349 (quoting Richard A. Nagareda, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U. L. REV. 97, 131–132 (2009)) (internal quotations omitted). A complaint's mere recital of questions that happen to be shared by class members is "not sufficient to obtain class certification." *Id.* Rather, "[c]ommonality requires the plaintiff to demonstrate that the class members 'have suffered the same injury.'" *Id.* at 349–50 (quoting *Falcon*, 457 U.S. at 157).

The broad class definition certified by the District Court includes a commonality issue. As previously set forth, the District Court certified a class defined as:

> All persons with qualified mobility disabilities who were or will be denied the full and equal enjoyment of the goods,

44

services, facilities, privileges, advantages or accommodations of any Steak 'n Shake restaurant location in the United States on the basis of a disability because such persons encountered accessibility barriers at any Steak 'n Shake restaurant where Defendant owns, controls and/or operates the parking facilities.

JA 75 (District Court Order).[21] Although the final clause in this one sentence definition refers to "parking

---

[21] A district court's certification order "must define the class and the class claims, issues, or defenses." FED. R. CIV. P. 23(c)(1)(B). Although "no particular format is necessary to meet the substantive requirement[s]" of Rule 23(c)(1)(B), *Wachtel ex rel. Jesse v. Guardian Life Ins. Co. of Am.*, 453 F.3d 179, 188 (3d Cir. 2006), we have previously explained that the rule requires "that the text of the [certification] order or an incorporated opinion . . . include (1) a readily discernible, clear, and precise statement of the parameters defining the class or classes to be certified, and (2) a readily discernible, clear, and complete list of the claims, issues or defenses to be treated on a class basis." *Id.* at 187–88. This substantive requirement "necessitat[es] the full and clear articulation of the litigation's contours at the time of class certification," and is intended to help "facilitate meaningful appellate review of complex certification

45

facilities," the definition does not strictly limit membership to those who have suffered harm *within* those parking facilities. The language adopted by the District Court is looser than that, and covers not only persons who allege that they have experienced ADA violations within a Steak 'n Shake parking facility but also class members who encountered "accessibility barriers at any Steak 'n Shake restaurant." JA 75. This could include claims, for instance, regarding the bathroom of a Steak 'n Shake that had maintained a perfectly ADA-compliant parking facility.

To comprehend just how large the potential universe of ADA violations covered by this broad class definition is, consider the Department of Justice's ADA Guide for Small Businesses, which defines "architectural barriers" as:

> [P]hysical features that limit or prevent people with disabilities from obtaining the goods or services that are offered. ***They can include parking spaces*** that are too narrow to

decisions." *Id.* at 186. *See also Neale*, 794 F.3d at 370 ("We are not required to comb through the District Court's opinion and layers of briefing in order to 'cobble together the various statements . . . and reach a general inference as to some categories of issues that the District Court believes are appropriate for class treatment.'" (quoting *Wachtel*, 453 F.3d at 189)).

accommodate people who use wheelchairs; a *step or steps* at the entrance or to part of the selling space of a store; round ***doorknobs or door hardware*** that is difficult to grasp; ***aisles*** that are too narrow for a person using a wheelchair, electric scooter, or a walker; ***a high counter*** or narrow checkout aisles at a cash register, and ***fixed tables*** in eating areas that are too low to accommodate a person using a wheelchair or that have ***fixed seats*** that prevent a person using a wheelchair from pulling under the table.

ADA Guide for Small Businesses, at 3, available at https://www.ada.gov/smbusgd.pdf (emphases added). Moreover, the Department of Justice's 2010 Title III ADA Regulations further illustrate the wide variety of different ADA violations that any one particular class member might allege to have encountered. For example, 28 C.F.R. § 36.304 provides:

Removal of Barriers.
(a) General. A public accommodation shall remove architectural barriers in existing facilities, including communication barriers that are structural in nature, where such removal is readily achievable, *i.e.*, easily accomplishable and able to be carried out without much difficulty or expense.

47

(b) Examples. Examples of steps to remove barriers include, but are not limited to, the following actions –

(1) Installing ramps;

(2) Making curb cuts in sidewalks and entrances;

(3) Repositioning shelves;

(4) Rearranging tables, chairs, vending machines, display racks, and other furniture;

(5) Repositioning telephones;

(6) Adding raised markings on elevator control buttons;

(7) Installing flashing alarm lights;

(8) Widening doors;

(9) Installing offset hinges to widen doorways;

(10) Eliminating a turnstile or providing an alternative accessible path;

(11) Installing accessible door hardware;

(12) Installing grab bars in toilet stalls;

(13) Rearranging toilet partitions to increase maneuvering space;

(14) Insulating lavatory pipes under sinks to prevent burns;

(15) Installing a raised toilet seat;

(16) Installing a full-length bathroom mirror;

(17) Repositioning the paper towel dispenser in a bathroom;

(18) Creating designated accessible parking spaces;
(19) Installing an accessible paper cup dispenser at an existing inaccessible water fountain;
(20) Removing high pile, low density carpeting; or
(21) Installing vehicle hand controls.

28 C.F.R. § 36.304. Given the wide variety of violations that different class members might claim to have encountered, the class definition certified by the District Court runs directly into conflict with the Supreme Court's guidance in *Dukes*.

In *Dukes*, the Court considered a class of female employees alleging Title VII gender discrimination. *Dukes*, 564 U.S. at 343. In conducting a Rule 23(a)(2) commonality inquiry, the Court explained:

> Commonality requires the plaintiff to demonstrate that the class members "have suffered the same injury," *Falcon*, *supra*, at 157, 102 S.Ct. 2364. ***This does not mean merely that they have all suffered a violation of the same provision of law. Title VII, for example, can be violated in many ways***—by intentional discrimination, or by hiring and promotion criteria that result in disparate impact, and by the use of these practices on

49

the part of many different superiors in a single company. Quite obviously, the mere claim by employees of the same company that they have suffered a Title VII injury, or even a disparate-impact Title VII injury, gives no cause to believe that all their claims can productively be litigated at once. ***Their claims must depend upon a common contention***—for example, the assertion of discriminatory bias on the part of the same supervisor. ***That common contention, moreover, must be of such a nature that it is capable of classwide resolution***—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke.

*Id.* at 349–50 (emphasis added).

Applying the Court's teaching in *Dukes* to the matter at hand, we conclude that Plaintiffs' class presents a similar commonality challenge. Although all class members might allege a violation of the ADA—even the very same provision of the ADA—this only establishes that putative class members "merely" allege to "have all suffered a violation of the same provision of law." *Id.* at 350. For purposes of satisfying Rule 23(a)(2), that is not

enough, because, like Title VII in *Dukes*, the ADA can be violated in many different ways.

One person, for example, might allege that Steak 'n Shake violated the ADA by failing to correct a steep slope in a parking facility, while other class members might allege that Steak 'n Shake violated the ADA by failing to replace inaccessible door hardware, by failing to widen bathroom doors, or by failing to replace inaccessible water fountains. *See* 28 C.F.R. § 36.304. While each of these Steak 'n Shake patrons presents a serious claim, the collective claims are so widely divergent that they would be better pursued on either an individual basis or by a sufficiently numerous class of similarly-aggrieved patrons. Such is the reach of the class as the District Court has defined it. With such a potentially wide array of different claims by members of the class, we conclude that the certified class fails to meet the commonality requirement of Rule 23(a)(2).

Even assuming, *arguendo*, that a proper interpretation of the class definition would limit the class to members who suffered injuries *within* a Steak 'n Shake parking facility,[22] the wide variety of regulations quoted

---

[22] Certification of a class is perhaps the most pivotal moment in the life of a class action. In light of the inappropriateness of certifying a class on tentative grounds, *Hydrogen Peroxide*, 552 F.3d at 321, mere promises to interpret a class definition in a limited fashion

51

above reveal that there are still various types of ADA violations that could occur specifically in a parking facility. Plaintiffs' own complaint, for example, lists seven different categories of parking facility violations. JA 90–92. The complaint refers to: (1) parking space slopes; (2) access aisle slopes; (3) slopes relating to the route leading to a facility entrance; (4) lack of proper parking signage; (5) lack of proper "van accessible" designations; (6) improper mounting of "accessible" parking signage; and (7) "curb ramp" slopes. *Id.* Although all seven of these categories allegedly constitute ADA violations, they harm class members in materially different ways.

A class member, for example, complaining that "accessible" parking signage was "mounted less than 60

---

will not save an otherwise overly-broad class definition from failing to satisfy Rule 23. If a class is defined too broadly, the time to correct the flaw is at the time of certification, or soon thereafter. *See Marcus*, 687 F.3d at 592 ("Even if the District Court shared counsel's understanding of the class definition, counsel's post hoc clarification is no substitute for a 'readily discernible, clear, and precise statement of the parameters defining the class . . . to be certified' in either the certification order or accompanying opinion." (quoting *Wachtel*, 453 F.3d at 187)).

inches above the finished surface o[f] the parking area," JA 91, has experienced harm different from that of a class member complaining that "[t]he surfaces of one or more access aisles had slopes exceeding 2.1%." JA 92. As *Dukes* makes clear, suffering "a violation of the same provision of law" is not enough. *Dukes*, 564 U.S. at 349. Instead, class members' claims must "depend upon a common contention" that "is capable of classwide resolution . . . in one stroke." *Id.* at 350. The wide variety of potential ADA violations captured in the broad class definition certified by the District Court does not lend itself to such a resolution. We therefore conclude that Plaintiffs have failed to satisfy Rule 23(a)(2).[23]

## C. *The Need for Remand*

In light of our resolution of the Rule 23(a) issues presented in this appeal, remand for further proceedings before the District Court is necessary. Upon remand, the parties may present the court with a newly-formulated class definition free of the Rule 23(a) deficiencies described above.

---

[23] Although determining the proper boundaries of a revised class definition is an issue better left to the District Court after remand, it seems to us that a class definition limited to *slope-related* injuries occurring *within* a parking facility would present a class definition much more likely to meet the commonality requirement of Rule 23(a)(2).

Specifically, as to Rule 23(a)(1) numerosity, Plaintiffs will need to provide additional evidence so that the District Court can draw reasonable inferences when considering how many disabled individuals might actually have experienced an ADA violation at a relevant Steak 'n Shake. This should not be a Herculean task. Plaintiffs' census data carries much—but not all—of their Rule 23 (a)(1) burden. Something more will be required to support a reasonable inference. As to Rule 23(a)(2) commonality, Plaintiffs must propose a class definition with a limited number of potential ADA violations. Such a class might, for example, be limited to slope-related injuries that occur within a Steak 'n Shake parking facility.[24]

## CONCLUSION

Plaintiffs seek to utilize the class action device to enforce one of our nation's landmark civil rights laws.

---

[24] Given our disposition of this appeal on Rule 23(a) grounds, we need not reach the Rule 23(b) issues raised by defendants. Nonetheless, the District Court should take care to abide by both *Dukes'* lesson that "Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class," *Dukes*, 564 U.S. at 360, as well as Rule 65's requirements that any injunction "state its terms specifically," FED. R. CIV. P. 65(d)(1)(B), and "describe in reasonable detail . . . the act or acts restrained or required." FED. R. CIV. P. 65(d)(1)(C).

However commendable the ultimate result Mielo and Heinzl seek may be, our analysis here is limited to two questions: First, whether Plaintiffs have Article III standing, and second, whether Plaintiffs have met their burdens under Federal Rule of Civil Procedure 23(a). While we conclude that Plaintiffs have standing to pursue their claims in federal court, we also conclude that Plaintiffs have failed to satisfy the requirements of Rule 23(a). The District Court's judgment will be reversed, and this matter will be remanded to the District Court for reconsideration of the class certification question.